UNITED STATES MORTGAGE CO. v. SPERRY and others.

(*Circuit Court, N. D. Illinois.* September 12, 1885.)

1. GUARDIAN AND WARD—JURISDICTION OF COUNTY COURTS IN ILLINOIS—MORTGAGING WARD'S LAND TO ERECT IMPROVEMENTS THEREON.
    A county court in Illinois has jurisdiction to pass an order authorizing a guardian to borrow money, secured by mortgage on the ward's land, for the purpose of erecting improvements thereon.
2. USURY—CORPORATION ORGANIZED UNDER LAW OF ONE STATE CHARGING INTEREST IN ANOTHER STATE IN EXCESS OF LEGAL RATE IN STATE WHERE CHARTERED.
    A corporation organized and authorized to loan money by a special act in

New York, wherein it is provided that no "loan or advance shall be made at a rate of interest exceeding the legal rate," is not prevented from charging interest on a loan made in another state at a rate in excess of that provided by statute in New York, but not in excess of the rate allowed by law in the state where the loan is made.

In Equity.

*Dexter, Herrick & Allen,* for complainant.

*J. V. Le Moyne* and *Lyman Trumbull,* for defendant Henry W. Kingsbury.

GRESHAM, J. On the fifth day of July, 1872, Anson Sperry, as guardian of the estate of Henry W. Kingsbury, minor, filed his petition in the county court of Cook county, Illinois, setting forth that the real estate of his ward in that county was subject to mortgages amounting to $78,500, some of which were due, and the holders were demanding payment, while others would soon mature, and the holders were willing to accept payment; that upon all of the mortgages there was overdue interest, payment of which was demanded; that a portion of the real estate consisted of lot 6, and part of lot 5, in block 35, in the original town of Chicago; that the buildings formerly on the premises were destroyed in the fire of October, 1871; that they constituted a very large part of the productive estate of the infant, were centrally located in the city, and before their destruction produced large rents; that persons interested in the estate, and its care and management, deemed it important the buildings should be restored and the property made productive; that no money had come into the guardian's hands with which to pay the mortgages or the accumulated interest, and that the present rentals were insufficient; that unless some provision was made, the mortgages would be foreclosed, and the premises sold; that it was believed the cost of constructing suitable buildings would be about $100,000; that for the purpose of funding the indebtedness, paying off the mortgages, and constructing new buildings, it would be necessary to borrow about $200,000; that Jane Kingsbury, the infant's grandmother, had been decreed to be entitled to one-third of the net rents as dower, and Eva Lawrence, his mother, to two-ninths of the net rents as dower in two-thirds of the premises, and his ward the residue. The petition concluded with a prayer that the guardian be empowered to make a loan not exceeding $200,000, and that the property, which was particularly described, might be mortgaged to secure the loan. An order was entered allowing the prayer of the petition, and providing that when any loan should be negotiated, the guardian should report the same, and the securities proposed to be executed, to the court for its approval.

On the sixth of August an order was entered, reciting that the guardian had submitted to the inspection of the court a mortgage and bond to the United States Mortgage Company, to secure a loan of $175,000 in gold; that it appeared to the court the mortgage was made in accordance with the previous order, and that the mortgage and the

guardian's action be approved. This mortgage was duly executed and recorded.

On the seventh day of March, 1873, the guardian filed a second petition, setting forth the making of the former mortgage, and that if the remainder of the gold received on the loan should be sold at the same premium as the last, he would receive, after defraying expenses, the sum of $194,646.38; that he had paid off mortgages (describing them) making a total of $68,643.81, leaving a balance of $126,002.58, which amount it was estimated would all, or very nearly all, be required in the construction of the building then being erected on the front of the lot, leaving unoccupied a tract of ground in the rear about 80 feet by 100 feet; that this ground was improved and occupied at the time of the fire by a public hall or theater; that upon careful consideration and consultation with persons most competent to advise in the premises, it was deemed for the interest of the estate to re-erect upon the lot a public hall, the cost and furnishing of which it was estimated would be about $70,000; that it was believed, from the present want of such a hall in that portion of the city, and the great demand therefor, such an investment would be highly judicious; that two of the original mortgages which were described remained unpaid, amounting to $15,000; that the avails of the former loan would be nearly all required in the payment of the mortgages and the construction of the proposed building; that the guardian had no money with which to pay off these incumbrances and to erect a building on the rear of the lot, unless it was borrowed by mortgage; that the entire estate consisted of real property, nearly all in the city of Chicago, and the only income to meet the various charges and incumbrances upon it, and its expenses and taxation, was to be derived from the rental; that no revenue could be derived from the rear portion of the lot, unless it was improved; that the premises before the fire had been largely productive, and it was believed, if judiciously improved, would be again equally productive. This petition concluded with a prayer that the guardian be empowered to make an additional loan in gold, not exceeding $75,000, and that the property, which was particularly described, might be mortgaged to secure the payment of the loan. An order was entered three days later allowing the prayer of this petition, with a provision that when the loan should be negotiated the guardian report the same, and the securities proposed to be executed, and all his transactions connected therewith, to the court.

On the fourth of April of the same year the guardian filed a further petition, setting forth that in the negotiations which he had made with the United States Mortgage Company prior to presenting his second petition, it was contemplated by it and the guardian that the mortgage should embrace a lot not included in the petition, which, by accident, was omitted in the petition and order; and that by reason of that omission he was not able to consummate the loan. He therefore prayed that the order be amended so as to include in it, and the

mortgage to be executed, the omitted lot. An order was entered allowing the prayer of this petition. Under these orders the guardian made a second mortgage to the United States Mortgage Company, to secure a loan of $70,000 in gold. No formal order appears to have been entered approving this mortgage, but on the tenth of July following the guardian filed a report, setting forth, in substance, the petition for authority to execute this mortgage, and the order allowing the prayer, and showing that, in pursuance of the power granted, he had procured from the United States Mortgage Company a further loan of $70,000 in gold, and had executed a bond and mortgage, which were also described; that he had received $21,595.30 in gold of this loan, which he had converted into currency, receiving a premium of $2,559.38. This report was duly approved by the court.

The guardian filed another report on the seventh of August of the same year, setting forth that he had received $40,000 more in gold under the second mortgage, upon which he had realized a premium of $6,500. This report was also approved by the court.

Sperry resigned his trust on the thirty-first of July, 1873, and Mrs. Eva Lawrence, the minor's mother, was thereupon appointed. Mrs. Lawrence filed an inventory on the seventh of November, 1873, showing as incumbrances the two mortgages, and that there was a balance of $8,404.70 due in gold under the last mortgage. This inventory was approved by the court.

On the second of April, 1874, Mrs. Lawrence filed a report, in which she stated that the estate was subject to the two mortgages, and that she had received the balance due on account of the second mortgage. She resigned her trust on the third of February, 1875, and Heman G. Powers was appointed her successor.

On the twelfth day of October, 1876, Powers filed a petition, setting forth at length the proceedings authorizing the two prior mortgages; that both had been submitted to and approved by the court; that the money loaned on the first mortgage had been duly expended by Sperry in payment of the indebtedness then existing, and in the erection of the contemplated buildings; that all the money received under the second mortgage ($61,595.30) had been expended by Sperry for the purposes expressed in the petition and order authorizing the loan, except the sum of $16,934.09, which he had paid to his successor, Mrs. Lawrence; that the balance of the second loan, namely, $8,404.90, had been paid to Mrs. Lawrence, and she had filed a report showing a balance in her hands of $517.77; that considerable sums still remained due and unpaid to contractors for the erection of the buildings, which were set forth in detail; that there was still due Thomas Swan, $10,000, which was a charge upon the real estate; that there was due and unpaid to the mortgage company, for interest on its loans, $51,987.04; that the mortgaged premises had been sold for city taxes for the year 1873, and that the mortgagee, under a provision in the mortgages, and at the request of the guardian, had advanced

$10,150.78, the amount necessary to purchase the tax certificates; that the state and county taxes for the year 1875, and previous years, amounting to about $9,000, remained unpaid; that the guardian had conferred with parties holding claims against the estate, and could compound and settle such claims on favorable terms; that $4,000 was due for cut stone used in the erection of the building, for which amount a personal judgment had been rendered against Sperry; that the supreme court of the state had declared Sperry was entitled to be indemnified out of the estate; that the revenue of the estate consisted of the rents, which were insufficient to meet the expenses and pay the various items of indebtedness, and the sums due Mrs. Kingsbury and Mrs. Lawrence as dower, and for the maintenance of the ward; that the mortgagee was willing, upon the authority of the court, to loan $95,-000 more in gold, on the security of a third mortgage upon the same real estate, and that this sum, converted into currency, would be sufficient to enable the guardian to satisfy all the indebtedness of the estate.

An order was entered granting the prayer of this petition, and authorizing the guardian to execute and deliver a third mortgage upon the real estate to secure the loan. Mrs. Kingsbury united with the guardian in all the mortgages, and Mrs. Lawrence united with him in the first and second mortgages. Powers resigned his trust on the twentieth of September, 1877, and John V. Le Moyne was thereupon appointed his successor. This suit was brought to foreclose the mortgages.

Section 18 of article 6 of the constitution of Illinois, adopted in 1870, declares that county courts shall be courts of record, and shall have original jurisdiction in all matters of probate, settlement of estates of deceased persons, appointment of guardians and conservators, and settlement of their accounts, and such other jurisdiction as may be provided for by general law.

The legislature of Illinois enacted a statute in relation to guardians and wards in 1872, which was in force when the three mortgages in controversy were executed. Section 2 of this act confers power upon county courts to appoint guardians of minors. Section 4 provides that, under the direction of the court, guardians shall have the custody, nurture, and tuition of their wards, and the care and management of their estates. Section 7 requires the guardian to give bond conditioned that he will faithfully discharge his trust, and manage and dispose of the estate according to law, and for the best interests of his ward. Section 19 provides that the guardian shall manage the estate of his ward prudently, and without waste, and apply the income and profits thereof, so far as the same may be necessary, to the comfort and suitable support and education of his ward. Section 22 provides that it shall be the duty of the guardian to put and keep his ward's money at interest upon security to be approved by the court, or invest the same in United States bonds, or other United States in-

terest-bearing securities. Personal security may be taken for loans not exceeding $100. Loans of any larger amounts shall be upon real-estate security. Section 23 provides that the guardian may lease the real estate of the ward upon such terms, and for such length of time, not exceeding beyond the minority of the ward, as the county court shall approve. Sections 24 and 25 read thus:

"Sec. 24. The guardian may, by leave of the county court, mortgage the real estate of the ward for a term of years, not exceeding the minority of the ward or in fee; but the time of the maturity of the indebtedness secured by such mortgage shall not be extended beyond the time of minority of the ward.

"Sec. 25. Before any mortgage shall be made, the guardian shall petition the county court for an order authorizing such mortgage to be made, in which petition shall be set out the condition of the estate, and the facts and circumstances on which the petition is founded, and a description of the premises sought to be mortgaged."

Section 28 provides that—

"On the petition of the guardian, the county court of the county where the ward resides, or if the ward does not reside in the state or the county where the real estate or some part of it is situated, may order the sale of the real estate of the ward, for his support and education, when the court shall deem it necessary, or to invest the proceeds in other real estate, or for the purpose of otherwise investing the same."

Did the three petitions which were presented to the county court give that court jurisdiction to enter the orders authorizing the execution of the mortgages? And if they did, was the plaintiff authorized to contract for the prevailing rate of interest in Illinois at the time the mortgages were executed? These are the real questions presented by the record.

It is contended by the defendant's counsel that the jurisdiction of the county court is wholly statutory, and that it can incumber a ward's estate by mortgage to raise money for the expenditures and investments specified in the statute, and for no other purpose; that neither the statute nor the common law authorizes expenditures in making repairs or permanent improvements upon the ward's estate; and that neither the county court nor a court of chancery has inherent original jurisdiction to direct that an infant's real estate be sold or mortgaged. The guardian's authority over the estate, it is urged, is limited to its care, management, and preservation, the putting of money out at interest, and the use of the income, or so much of it as may be necessary, in the support and education of the ward. It is admitted, however, that under the statute the county court may authorize the guardian to mortgage the ward's real estate when necessary for the ward's support and education, or for the preservation of the estate.

A guardian, under the direction of the court, and when the interest of the estate clearly seems to require it, may lay out money in repairs and permanent improvements; he may change real into personal property, and *vice versa;* and, in short, he may do what a prudent

man would do in the management of his own affairs.    Chamb. Inf.
§§ 505, 541, 596.

The only source of income may be the ward's improved real estate,
which is liable to become unproductive by fire or other cause.    In such
a case it is said the guardian may lease or ,sell the real estate.    But
he may not be able to do either without manifest injury to the estate.
The expenditure of a comparatively small sum in making needed re-
pairs, or in erecting buildings, may be clearly necessary and judicious,
and yet, we are told, the power exists to do neither.    The guardian
is charged with the duty of preserving and managing the ward's es-
tate, and in the discharge of that duty it may be quite as necessary
to repair and make permanent improvements upon real property as
to lease or sell it.    The power to do either is liable to be abused, but
no good reason can be given why it should exist in one case and not
in the other.

The language of section 24, conferring power to mortgage, is as un-
qualified as the language in other sections which confer the power to
lease and sell.    Section 24 does not say the mortgage shall be exe-
cuted to raise money for a particular purpose only, or for the purpose
specified in the statute.    In *Smith* v. *Sackett*, 5 Gilman, 534, the court
said:                                 `

"The jurisdiction of the court of chancery to order the sale of the whole or
portion of the estate of an infant, or to order it to be incumbered by mortgage
whenever the interest of the infant demands it, will not be denied, whether
that interest be of a legal or an equitable nature."

*Allman* v. *Taylor*, 101 Ill. 185, was decided as late as 1881, and in
that case the court referred with approval to the ruling in *Smith* v.
*Sackett*, *supra*.

It would seem, from a careful reading of the statute, that the legis-
lature intended to confer upon the county courts a general jurisdic-
tion over guardians of infants and the management of their estates.
In speaking of the powers and jurisdiction of such courts in this con-
nection in *Bond* v. *Lockwood*, 33 Ill. 212, the supreme court of Illi-
nois said:

"The authority of the county court in this regard is similar to that of a
court of chancery.    The provisions of the statute in relation to guardians were
not designed as a complete code, but were enacted to confer upon the county
court power to appoint guardians, and to regulate their conduct in accord-
ance with their duties at common law    Some imperfections in the common
law were remedied, and a more simple and convenient mode of procedure was
introduced.    While some of its provisions were declaratory of the common
law, and were appropriately introduced in conferring jurisdiction upon a new
tribunal, it is evident that many of the powers and duties, rights and liabil-
ities, of guardians are not, by the statute, specifically defined.    The statute
contains such provisions as were necessary to define the nature of the juris-
diction conferred, prescribe the manner of its exercise, and correct some of
the defects of the law as it then existed.    In other respects the common law
regulating the powers and duties, rights and liabilities, of guardians was left

in force. At common law all guardians were regarded as trustees, clothed with such powers and rights as were necessary for the discharge of the trusts imposed upon them, and they were held accountable for the faithful discharge of their duties."

Section 25 provides that before any mortgage shall be made, the guardian shall petition the county court for an order authorizing such mortgage, in which petition shall be set out the condition of the estate, and the facts and circumstances on which the petition is founded, and a description of the premises sought to be mortgaged.

The petitions which were presented to the county court satisfied that section, and gave the court jurisdiction to enter upon the inquiry which resulted in the orders authorizing the guardians to execute the bonds and mortgages. Those orders cannot be attacked collaterally, and they are conclusive in this suit. The petitions and the orders which were based upon them were not adversary proceedings against the ward. *Allman* v. *Taylor, supra.*

A further objection is made to the second bond and mortgage that they were not approved by the court. The statute required no such approval; but if it did, the court was more than once informed that the bond and mortgage had been executed, and they were in effect approved, as the statement of facts shows.

The complainant was incorporated, under a special act passed by the legislature of New York in 1871, to loan money to individuals, corporations, associations, states, cities, provinces, towns, and other municipal bodies on bond and mortgage on real estate situated within the United States. Section 21 of the charter reads as follows:

"No loan shall be made, directly or indirectly, to any director or officer of the company, nor shall any loan or advance be made at a rate of interest exceeding the legal rate."

It is contended that under this section the complainant is not permitted to contract for a rate of interest in excess of the rate allowed by the laws of New York at the time the loan is made, and that the bonds and mortgages in this case, so far as they relate to interest, are absolutely void, although the interest contracted for was legal at the time and place of the contract.

Every country determines for itself what is a just compensation for the use and risk of money lent within its own territorial limits. The rate varies in different states and countries according to the varying conditions affecting the value of money. A rate which will reasonably compensate the lender in an old country, where money is abundant and values are less fluctuating, would not be reasonable in new countries where capital is needed and investments are attended with greater hazard. The rate of interest is regulated according to the risk attending the loan and the value of the money in the country in which it is lent. 3 Bing. 193.

At the time the act was passed chartering the complainant, 7 per cent. was the legal rate in the state of New York, and 10 per cent. was

the legal rate in Illinois and other western states. Other New York corporations, as well as citizens of that state, were at liberty to go into other states and loan their money at rates allowed by the local laws; and what reason could have operated for prescribing a different rule for the complainant? Can it be said that the legislature of New York intended to arbitrarily determine that whatever money might be worth from time to time in that state should be taken as its value by the complainant in making loans in other states? The question admits of but one answer. Usury laws are local, having no extraterritorial effect, and no special reason has been given, or can be given, why the legislature which incorporated the complainant intended that it should not be allowed to loan its money abroad at a rate which was fair and just at the place of contract. Each state may be safely trusted to determine what is a just compensation for the use of money within its own territorial limits, and to protect its own citizens against avarice. The people of Illinois and other states do not need the protection of the laws of New York in this respect; and it cannot be assumed that the legislature of that state has undertaken to afford such protection.

The bonds and mortgages expressly provide that they shall be construed and governed by the laws of Illinois in force at the date of the contract. Those laws allowed 10 per cent. as a just compensation under existing conditions. The loans were at 9 per cent. The court is asked to hold that the bonds and mortgages, so far as they relate to interest, are *ultra vires* and void, because 7 per cent. was the maximum legal rate in New York. Nothing but the most positive and explicit expressions could justify the belief that the legislature of New York intended to prohibit one of its own corporations from employing its capital in other states on terms less favorable than the laws of such other states allowed as just.

The complainant's charter simply required that it loan money at no higher rate than the legal rate at the time and place of the loan. This was in conformity with a well-established usage and rule of law. It may be conceded that this construction renders unnecessary that part of section 21 which relates to interest, but unnecessary and useless provisions are frequently inserted in statutes and charters out of abundance of caution. *Philadelphia Loan Co.* v. *Towner*, 13 Conn. 248; *Bowen* v. *Lease*, 5 Hill, 221.

But admitting that the complainant violated its charter in contracting for interest in excess of the legal rate in New York, still the defendants cannot escape payment. The complainant fully performed the contracts on its part. It paid the guardians the full amount of the several loans, and common sense and justice alike require that the other parties to the contract should not be permitted to escape performance by pleading want of authority in the complainant. It is for the state of New York to deal with the complainant if it has violated its charter. *National Bank* v. *Matthews*, 98 U. S. 621. Courts are not inclined to allow parties who have received the full benefit

of *ultra vires* contracts to escape payment of the sums justly due from them, under shelter of a plea of *ultra vires*.

A decree will be entered in favor of the complainant, in accordance with this opinion.