# CASES

ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF ILLINOIS.

WALTER P. WARREN *et al.*

*v.*

THE FIRST NATIONAL BANK OF COLUMBUS.

*Filed at Ottawa October 26, 1893.*

1. ASSIGNMENT—*of part of a debt.* While a part of a debt or chose in action is not assignable at law, it may be assigned in equity, and in such case a trust will be created in favor of the equitable assignee of the fund, and will constitute an equitable lien upon it.

2. Equity recognizes an interest in the fund, in the nature of equitable property, attained through the assignment, or the order which operates as an assignment, and permits such interest to be enforced by action, even though the debtor or depositary has not assented to the transfer. The same equitable doctrine applies to an equitable assignment of any definite part of the fund or debt. But to perfect the equitable title in the assignee, notice must be given to the drawee or the debtor.

3. It is immaterial that the fund upon which the draft or order is drawn is not yet due, or that it is not actually in being, if it exists potentially, for even in that case the order will operate as an equitable assignment of the fund as soon as it is acquired, and will create an interest in it which a court of equity will enforce.

4. CORPORATIONS—*charter and general statutory restrictions on their powers—enforcement of, without State of creation.* It is the charter of the corporation, alone, which by the law of comity is recognized and enforced in other jurisdictions, and not the general legislation of the State in which the company is formed. The general laws and regulations of a State are intended to govern only within the limits of the State enacting them, and the State can have no power to give them extra-territorial force. Such provisions do not, as a rule, enter into contracts made within the State, if they are to be performed in another jurisdiction.

5. It follows, therefore, that when a State statute is enacted for the enforcement of a local policy, only, it will not be presumed that such provision was intended by the State, or by the shareholders forming the corporation, to enter into the charter contract, and to regulate the company in its transactions outside of the State, and they will not affect the validity of the dealings of the company in foreign States.

6. A corporation formed under a law of the State of New York, which contained no restriction on its power to secure one creditor over another, and thus make a preference, at its place of business in the State of Ohio, gave a bank, to secure a debt, a written order on a corporation doing business in this State, for the payment of $20,000, being a part of the sum owing by the latter company, which it refused to accept. The general law of the State of New York prohibited corporations in contemplation of insolvency from preferring any creditor. A creditor of such debtor corporation brought attachment in this State, and garnisheed the corporation upon which the order was given. It also appeared that the corporation doing business in Ohio was on the eve of insolvency, and had determined to make a general assignment at the time it gave the order: *Held,* that the general statute of New York prohibiting the assignment or transfer of property in contemplation of insolvency had no application to the assignment of a fund in this State, executed in Ohio, and that the order and notice to the drawee passed an equitable transfer of the sum named in such order.

7. SAME—*assets—how far a trust fund.* The doctrine recognized in this State is, that the property of an insolvent corporation is a trust fund in such sense as to preclude the directors and officers of the corporation from dealing with it in such manner as to secure preferences for themselves. But this court has not gone so far as to hold that the mere insolvency of a corporation *eo instanti* deprives the directors and officers of the power to dispose of the corporate property in good faith, by way of paying or securing corporate debts, even though the result may be to give certain creditors a preference over others.

8. SAME—*power to prefer creditors.* Corporations, unless restricted by their charters or by general statutes, may make assignments for the

benefit of creditors, to the same extent that individuals may, and in making an assignment may make preferences for one or more creditors over others, or of one class of creditors over other classes. But a preference by the directors to themselves is generally fraudulent.

9. A corporation of another State, having debts owing to it by parties residing in this State, may, even after its insolvency, transfer such debts or other property to one creditor in preference of all others, and if done in good faith, and such transfer may be made by a written order on the resident debtors to pay to the creditor so preferred.

10. FACTOR—*lien.* By the common law a factor has a general lien upon all the goods of his principal in his possession, and upon the price of such as are lawfully sold by him, and upon the securities received therefor to secure the payment of the general balance of the accounts between himself and his principal, as well as for the advances, charges and disbursements made upon or in reference to the particular goods.

11. SAME—*possession necessary to his lien.* To obtain such lien the factor must have the goods lawfully in his possession. Delivery to the factor's servant will be sufficient. So, putting the goods upon the factor's dray, to be drawn to his warehouse, is sufficient possession. Some cases hold that where advances have been made in reliance upon a promise to subsequently consign the goods, a delivery to a common carrier, consigned to the factor, is sufficient.

12. SAME—*differs from a broker.* One of the essential differences between a factor and a broker is, that while the former has the possession of the goods to be sold, the latter has not. Hence it follows that the common law lien is given to the former, but is denied to the latter.

13. APPEAL—*trial de novo in chancery suits.* In cases in chancery where the evidence has not been taken orally in open court, in the presence of the chancellor, this court is not concluded by the finding of the facts by the court below, but may examine and pass upon the evidence *de novo.* But still, some degree of weight is properly due to the concurring decisions of the trial and Appellate Courts in their findings from the evidence.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. O. H. HORTON, Judge, presiding.

Mr. E. R. JEWETT, for the appellant the Baltimore and Ohio Railroad Company.

Messrs. WARREN & COX, and Messrs. FLOWER, SMITH & MUSGRAVE, for the appellant Walter P. Warren:

The order was given without any consideration, as collateral security for two notes held by the bank of Columbus, which were not due.    There are five objections to this claim:

*First*—The order was drawn by H. C. Stanwood, who signed as assistant treasurer, but who had no authority whatever to draw such a draft.    Taylor on Corp. sec. 236; *Koch* v. *Building Ass.* 35 Ill. App. 465; *Adams* v. *Cross, etc. Co.* 27 id. 313; *Stokes* v. *Pottery Co.* 46 N. J. L. 237; *Morgan Co.* v. *Thomas,* 59 Ill. 479; *Reed* v. *Buffum,* 79 Cal. 77; *Titus* v. *Railroad Co.* 8 Vroom, 98; Morawetz on Corp. sec. 585, *et seq.; Leggett* v. *Banking Co.* Saxt. 541; *Stowe* v. *Wyse,* 7 Conn. 214; *Hyde* v. *Larkin,* 35 Mo. App. 365; *Railroad Co.* v. *James,* 22 Wis. 194; *Hoyt* v. *Thompson,* 5 N. Y. 320, and 19 id. 207; *Bank* v. *Farmers, etc. Co.* 14 Wis. 325.

*Second*—The order was a partial assignment of a particular fund to become due, to the drawer, and is not good unless accepted.    Such an assignment is good only when the person who is to pay raises no objection.    *Mandeville* v. *Welsh,* 5 Wheat. 278; *Chapman* v. *Shattuck,* 3 Gilm. 49; *Crosby* v. *Loop,* 13 Ill. 625, and 14 id. 330; *Railroad Co.* v. *Nichols,* 57 id. 464.

*Third*—The draft is void under the New York statute, because at the time it was given the Ohio and Western Coal and Iron Company had refused the payment of its notes, and the order was drawn and delivered with the intent, and such was its effect, of assigning or transferring the property of the company for the benefit of John M. Glidden, who was a stockholder in and the president of the company.    Rev. Stat. of New York, 1827-28, sec. 4, chap. 18; *Lippincott* v. *Carriage Co.* 25 Fed. Rep. 577; *Adams* v. *Kehlor Co.* 35 id. 433.

*Fourth*—The order or draft is void under the New York statute, because it was given in contemplation of the insol-

vency of the Ohio and Western Coal and Iron Company. Rev. Stat. of New York, 1827-28, sec. 4, chap. 18; *Robinson* v. *Bank,* 21 N. Y. 406; *Brouwer* v. *Harbeck,* 5 Selden, 589; *Bowen* v. *Lease,* 5 Hill, 221; *Harris* v. *Thompson,* 15 Barb. 62; *Sibell* v. *Remsen,* 33 N. Y. 95; *Paulding* v. *Chrome Co.* 94 id. 334; *Pierce* v. *Crompton,* 13 R. I. 312; *Starkweather* v. *Bible Society,* 72 Ill. 50; *Female Academy* v. *Sullivan,* 116 id. 385; *Bank* v. *Godfrey,* 23 id. 579, and note; *Ewing* v. *Bank,* 43 Ohio St. 31; Waite on Insolvent Corp. sec. 328.

*Fifth*—The order or draft is invalid under the common law, as declared by the decisions in the State of Ohio, because it was a preference given by an insolvent corporation, which had ceased doing business. Morawetz on Corp. sec. 803; Waite on Insolvent Corp. secs. 162, 654; *Rouse* v. *Bank,* 46 Ohio St. 493; *Woolen Mills* v. *Kampe,* 38 Mo. App. 229.

The claim of Glidden & Curtis for a lien on this fund rests upon the alleged indebtedness for $422,365.79 less $33,384.29, from the Ohio and Western Coal and Iron Company. There is no legal proof in the record of this indebtedness. Glidden & Curtis, as sales agents, never had such possession of the property out of which this fund arises as to acquire a lien thereon. Mechem on Agency, sec. 676, *et seq.; Strahorn* v. *Stock Yards Co.* 43 Ill. 427; *Winne* v. *Hammond,* 37 id. 99.

Glidden & Curtis acquired no right to a lien on this fund by virtue of the contract of November 3, 1887. *Boomer* v. *Cunningham,* 22 Ill. 320; *Hunt* v. *Bullock,* 23 id. 320; *Allen* v. *Montgomery,* 48 Miss. 101; *Strong* v. *Crabbs,* 63 id. 338; *Hoffman* v. *Brungs,* 83 Ky. 400; *Cook* v. *Brannin,* 87 id. 000; *Insurance Co.* v. *Olmsted,* 33 Conn. 476; *Clay* v. *Railroad Co.* 62 Tenn. 421; *Reed* v. *Moseby,* 87 id. 759; *Moody* v. *Wright,* 13 Metc. 17; *Chynoweth* v. *Tenney,* 10 Wis. 403; *Stearns* v. *Insurance Co.* 124 Mass. 63; *Chase* v. *Benny,* 130 id. 556; *Christmas* v. *Russell,* 54 Wall. 69; *Ford* v. *Garner,* 15 Ind. 288; *Rogers* v. *Hosacks,* 18 Wend. 318; *Hall* v. *Bank,* 13 Ga. 341; *Bromwell* v. *Turner,* 37 Ill. App. 561.

The contract of November 3, 1887, was not a valid contract, because procured by Glidden for the benefit of his firm when the company was insolvent and he the president thereof. *Beach* v. *Miller*, 130 Ill. 170; *Atwater* v. *Bank*, 40 Ill. App. 501; 1 Beach on Private Corp. sec. 241 b.

Messrs. SMITH, HELMER & MOULTON, for the appellant Marcus A. Thompson.

Mr. LYNDEN EVANS, and Mr. FREDERICK ARND, for the other appellants:

When the goods are consigned to a factor, and he makes advances on them, he has the right to sell them, and may, out of the proceeds, satisfy his lien. 2 Kent's Com. sec. 44, p. 642; *Zort* v. *Millandon*, 16 Martin, 470.

The lien also extends to proceeds of the goods. *Hudson* v. *Granger*, 5 B. & A. 22; *Keiser* v. *Topping*, 72 Ill. 226; *Jarvis* v. *Rogers*, 15 Mass. 389.

An agreement to pledge property to come into being makes the pledge attach immediately upon the property coming into being. Where a brick-maker agreed to give bricks in his manufactory as a security for advances, the lien was held to attach the moment the bricks were made. *Macomber* v. *Parker*, 14 Pick. 487; *Donald* v. *Hewitt*, 33 Ala. 534; *Smith* v. *Atkins*, 18 Vt. 481; *Goodenough* v. *Dunn*, 21 Me. 86; *Ayres* v. *Banking Co.* L. R. 3 P. C. 548; *Wisner* v. *Ocumpaugh*, 71 N. Y. 113; *Coates* v. *Donnell*, 16 J. & S. 46; *Barnard* v. *Norwich, etc.* 4 Cliff. 351; *Kirksey* v. *Means*, 42 Ala. 426; *Bibend* v. *Liverpool, etc.* 30 Cal. 78.

On future property this lien is good against subsequent contract creditors of the lienor. Jones on Liens, sec. 42; Jones on Chattel Mortgages, sec. 157; *Telford* v. *Wilson*, 3 Head, 311.

The case of *Telford* v. *Wilson* was again referred to with approval in *Pope* v. *Foster*, 54 Tenn. 98, where it was held that

a contract for future property could be enforced between the parties, and against creditors or purchasers with notice, even without registration. It was again referred to and quoted and approved in *Warehouse Association* v. *Owen*, 86 Tenn. 355, and again cited and approved in *Reed* v. *Moseby*, 87 Tenn. 759.

Furthermore, the law is that the pledgee does not lose his lien by permitting the pledgor to have the property for a special and limited purpose. *Cooper* v. *Ray*, 47 Ill. 53; *Hutton* v. *Arnett*, 51 id. 198; *Langton* v. *Waring*, 18 C. B. (N. S.) 315; *Way* v. *Davidson*, 12 Gray, 465.

Mr. JOHN S. COOK, for the appellant Ellicott.

Messrs NORTON, BURLEY & HOWELL, for the appellee:

The order or draft in question operated as an equitable assignment, *pro tanto*, of the fund in the hands of the Pullman company from the time of its delivery. Notice to the drawee was not necessary to perfect the title of the bank as against any party to this cause. This doctrine is abundantly sustained by authority. 3 Pomeroy's Eq. Jur. secs. 1280, 1281, and notes; *Pomeroy* v. *Insurance Co.* 40 Ill. 398; *Bank* v. *Banking Co.* 114 id. 483; *Phillips* v. *Edsall*, 127 id. 547.

The fact that the debt against which the draft was drawn was not then due and payable is immaterial, as courts of equity will give effect to an assignment of a fund to become due. 3 Pomeroy's Eq. Jur. sec. 1283, and cases cited; *Anderson* v. *DeSoer*, 6 Gratt. 364.

In the latter case it was held that a draft drawn by a legatee on executors, for the amount of the legacy, would take precedence of the attachment delivered four days after the drawing of the drafts and before the presentment. See, also, 1 Am. & Eng. Ency. of Law, 830, 840; 2 Story's Eq. Jur. (13th ed.) sec. 1044; 1 Daniel on Neg. Inst. (3d ed.) sec. 23.

An insolvent corporation may deal with its creditors by making payment, etc. Waite on Insolvent Corp. sec. 162;

2 Morawetz on Corp. secs. 802, 804; Cook on Stock and Corp. Law, sec. 691; *Paulding* v. *Steel Co.* 94 N. Y. 346; *Dutcher* v. *Bank,* 59 id. 12; *Reichwald* v. *Hotel Co.* 106 id. 439; *Ragland* v. *McFall,* 137 id. 81; *Glover* v. *Lee,* 140 id. 102; *Weber* v. *Mick* 131 id. 526.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

On the 5th day of October, 1889, Pullman's Palace Car Company, being a debtor of the Ohio and Western Coal and Iron Company, a corporation organized under the laws of the State of New York, in the sum of $31,695.63, filed its bill of interpleader, in the Circuit Court of Cook county, against the First National Bank of Columbus, Ohio, the trustees of the late firm of Glidden & Curtis, the Ohio and Western Coal and Iron Company and James A. Hall, its assignee, and divers creditors of that corporation who were seeking to reach the indebtedness in question by process of garnishment, praying to have these various claimants upon the fund in its hands brought into court and required to interplead as to their respective interests and priorities. The defendants having appeared and answered, the cause was heard on pleadings and the master's report, and it was decreed that a proper case for an interpleader was presented, and the complainant having paid into court the full amount of the indebtedness in question, the defendants were perpetually enjoined from proceeding further against it for the collection of the same, and it was ordered that the fund thus paid into court stand in lieu of the complainant's liability as garnishee or otherwise.

The cause, as between the several defendants, being afterwards heard, it was adjudged and decreed that the claims of four of the attaching creditors, viz., those of Walter P. Warren, the Baltimore and Ohio Railroad Company, Evan T. Ellicott and Marcus A. Thompson, aggregating $22,771.97, were entitled to priority, and those claims, with interest thereon from the date of the decree, were ordered to be paid

in full, and it was further decreed that the First National
Bank of Columbus was entitled to the residue of the fund,
after the payment in full of these four attaching creditors.
From this decree the First National Bank of Columbus and
the trustees of Glidden & Curtis appealed to the Appellate
Court, and in that court the decree was reversed and the cause
was remanded to the Circuit Court, with directions to enter a
decree giving priority to the claim of the bank, amounting to.
$16,676.79, and ordering that claim, with interest thereon
from March 1, 1889, to be first paid in full, and ordering
payment of the residue of the fund to the trustees of Glidden
& Curtis. From the judgment of the Appellate Court, the
four attachment creditors and the trustees of Glidden & Curtis
have appealed to this court.

The facts in relation to the claim of the First National
Bank of Columbus, Ohio, as shown by the evidence, are sub-
stantially these: On February 8, 1889, and prior to that
time, the trustees of the Ohio and Western Coal and Iron Com-
pany resided in Massachusetts, Maine, New York and Penn-
sylvania, and one of their number, James A. Hall, who was
also vice president of the company, resided at Columbus, Ohio.
John M. Glidden, the president, and George R. Chapman, the
treasurer, resided and had their office at Boston, Massachu-
setts, and Chester Griswold, the secretary, resided and had
his office in the city of New York. · The company had an office
in New York City where its corporate meetings were held, and
it also had an office in Boston, where its principal financial
business was transacted, and also one at Columbus, where
its principal operative business was carried on, its mines and
furnaces being all situated in Ohio. Books of account of the
transactions in Ohio were kept at the Columbus office, and
books of account were also kept at Boston. The representa-
tives of the company residing at Columbus were Hall, the
vice president, and H. C. Stanwood, whose office or agency, as
he was known and held out to the world, was that of assist-

2—149 ILL.

ant treasurer, and he had, ever since the organization of the company, which was then about six years, been performing the duties appropriate to that position, and had been recognized by the company in many ways as holding that office. It is now claimed, however, that no such office as assistant treasurer was provided for by the by-laws of the company, and that there is no record upon the books of the company of Stanwood's appointment to that office, but the evidence clearly warrants the conclusion that, from the first organization of the company down to the time of the transactions in question in this suit, he had actual charge of the financial affairs of the company at Columbus, and was, *de facto*, its treasurer at that place.

In transacting its financial business in Ohio, the company, from the first, kept its bank account with the First National Bank of Columbus, the business with the bank being all transacted, on the part of the company, by Stanwood. All deposits were made by him, and all checks bore his signature, although a part of the checks seem to have been also countersigned by Hall, the vice president, while others were signed by Stanwood alone. Among other financial transactions between the bank and the company, Stanwood drew, through the bank, a large number of drafts, in favor of the company, on Glidden & Curtis of Boston, which were honored.

In January, 1889, the company was indebted to the bank in the sum of $20,000, for money previously borrowed, and in renewal of which indebtedness it gave its two promissory notes for $10,000 each, one dated January 10 and the other January 12, 1889, and each payable, thirty days after date, to the order of Glidden & Curtis, and indorsed by them. This loan was made at the earnest solicitation of Stanwood, and the business with the bank in relation to it was transacted by him. The loan seems to have been made principally upon the financial standing and credit of Glidden & Curtis, who were then reputed to be wealthy and responsible, the bank

having declined to make the loan on the credit of the Coal and Iron Company alone. On the night of February 8, 1889, the officers of the bank having learned that Glidden & Curtis had failed and had made an assignment for the benefit of their creditors, and being alarmed about their security upon the notes, sent for Stanwood, who was the only officer of the company then in Ohio, and demanded further security from the company. No security was given that night, but at about nine o'clock the following morning, Stanwood executed and delivered to the bank the following instrument:

"COLUMBUS, OHIO, *February 8, 1889.*
"*To the Pullman Palace Car Co., Pullman, Ill.:*

"Please pay to the First National Bank of Columbus, Ohio, or order, the sum of twenty thousand dollars, of the money owing by you and to become due to us on or about the 15th day of February and the 15th day of March, 1889, value received by us, and charge the same to our account.

THE OHIO AND WESTERN COAL AND IRON CO.,
By H. C. STANWOOD, *Asst. Treasurer.*"

Notice of the execution of this instrument was at once given to the Pullman Company by telegraph, and on February 11 it was presented to that company and protested for non-acceptance, and on the 15th day of February, and again on the 15th day of March, it was presented and protested for non-payment.

On February 9, Thompson began his suit by attachment, in the Circuit Court of Cook county, against the Coal and Iron Company, and caused the Pullman Company to be summoned as garnishee. This attachment was followed at different dates, by those of the other attaching creditors, and on February 11 the Coal and Iron Company made an assignment to James A. Hall, assignee, the deed of assignment being delivered to Hall, and filed for record in the Probate Court of Franklin county, Ohio.

The first proposition affecting the claim of the bank to priority, raised by counsel for the appellants is, that Stanwood had no authority to execute to the bank the instrument above set forth, and that such instrument therefore was ineffectual as an assignment to the bank of any portion of the fund in the hands of Pullman's Palace Car Company. The question thus raised is one of fact to be determined from all the evidence, and it must be confessed that the testimony of the various witnesses applicable to that question is far from being harmonious.

It is to be noticed, however, that both the Circuit and the Appellate Courts, after considering the evidence, have reached the conclusion that Stanwood was vested by the Coal and Iron Company with competent authority to execute the order on its behalf. While in cases in chancery, where, as in the present case, the evidence has not been taken orally in open court in the presence of the chancellor, we are not concluded by the decision of the courts below, but may examine and pass upon the evidence *de novo*, still some degree of weight is properly due to the concurring decisions of the two courts to whose judicial investigation the evidence in the case has already been subjected. We have nevertheless given the evidence an earnest and careful consideration, and while it must be said that the question is not altogether free from doubt, we are inclined to concur with the conclusion reached by the courts below.

The evidence in the case is very voluminous, the abstract of the record constituting a volume of over 540 printed pages. It is manifest therefore that any attempt on our part to give such an analysis of the evidence as will adequately show the grounds upon which our conclusion is based would involve an expenditure of time and space which, in view of the pressure of other duties, we can but ill afford, and which after all would subserve no useful purpose. It may be said briefly, that it is clearly shown that, in his position of assistant treasurer, Stan-

wood had general control of the fiscal concerns of the company in Ohio, especially in the absence of Hall, the vice president, and it appears that at the time the instrument in question was executed, Hall had gone to New York to attend a corporate meeting, leaving the entire charge of the financial concerns of the company in Ohio in Stanwood's hands. Hall testifies that as to financial matters—matters in respect to loans and their payment—Stanwood had always been authorized to act for the company; that in the absence of the witness, Stanwood conducted the financial business of the company, and that witness had no recollection of having ever notified the bank of any limitation upon Stanwood's power to manage financial matters. On further examination he says that the particular part of the company's business at Columbus which Stanwood attended to was the money part; that he had charge of all matters of money at the Columbus office, including the account at the bank; that he negotiated the $20,000 loan, and was in the habit of negotiating loans at Columbus; that he signed checks on the bank, which the witness countersigned while there, but that when he was away, Stanwood drew checks without his countersigning them.

Stanwood himself testifies that the duties he performed as assistant treasurer were all the financial duties; the entire business of the company so far as it related to the disbursing of money, the collection of accounts, and the care of property under his charge; that he attended to the building of some 150 houses; that he bought most of the supplies of all kinds, and had the general conduct of the business, up to the time Hall came to Ohio, which was in July, 1887, except the operation of the furnaces and coal mines; that he had charge of the financial business entirely, and of everything connected with that department; that he kept the accounts with the bank, looked after deposits and drew the checks; that he negotiated the $20,000 loan and also other loans; that on certain occasions he signed notes for the company, in pursu-

ance of special directions for that purpose; that Hall, after coming to Columbus, had general supervision of the mines and furnaces, but had nothing whatever to do with the financial affairs of the company; that there was never a single transaction of any sort or nature connected with the financial department of the company that anybody else attended to except himself, from the organization of the company to the date of its failure.

John M. Glidden, the president of the company, testifies, on cross-examination, that, as he understands it, Stanwood managed the financial affairs of the company at Columbus generally and continuously for several years, ending at the time of the failure, in the capacity of assistant treasurer; that he was recognized by the officers of the company, and by its agents and employes and the public generally, as the assistant treasurer of the company; that witness himself recognized Stanwood as assistant treasurer of the company, and recalls no instance where he dissented from his acts as such.

The foregoing is not and is not intended to be a complete statement of the evidence applicable to the question under consideration, but it is sufficient, we think, to show, that Stanwood, under the designation of assistant treasurer was a fiscal officer or agent of the Coal and Iron Company, clothed with very broad and general powers. The fund in the hands of the Pullman Company consisted of money due and to become due for products of the coal mines of the Coal and Iron Company, and it seems therefore to have properly pertained to the department of the financial business of that company which was under the control and supervision of Stanwood. We are of the opinion then that in view of all the evidence, it must be held that the appropriation of a portion of that fund to the satisfaction or securing of the $20,000 loan was within the scope of the powers conferred by the company upon him.

Nor do we think it necessary, in order to sustain this view, to resort to the doctrine of estoppel, or to draw any distinction

between the actual and the apparent scope of his authority as agent. The case does not rest, as it seems to us, upon proof of the acts of the company in holding him out as its agent possessing sufficient authority to enable him to execute on its behalf the instrument in question, but the evidence tends to establish an actual delegation of powers broad enough for that purpose.

It is next contended that the order upon the Pullman Company was only a partial assignment of the fund due or to become due to the drawer, and that as it was not accepted by the drawee, it was ineffectual to pass the title thereto to the bank in whose favor the order was drawn. In this view we are unable to concur. While a part of a debt or chose in action is not assignable at law, it may be assigned in equity, and in such case, a trust will be created in favor of the equitable assignee of the fund, and will constitute an equitable lien upon it. *Phillips* v. *Edsall*, 127 Ill. 535. On this question, Mr. Pomeroy, in his Treatise on Equitable Jurisprudence, says: "Equity recognizes an interest in the fund, in the nature of equitable property, obtained through the assignment, or the order which operates as an assignment, and permits such interest to be enforced by an action, even though the debtor or depositary has not assented to the transfer. It is an established doctrine that an equitable assignment of a specific fund in the hands of a third person, creates an equitable property in such fund." And again: "The agreement, direction or order, being treated in equity as an assignment, it is not necessary that the entire fund or debt should be assigned; the same doctrine applies to an equitable assignment of any definite part of a particular fund. The doctrine that the equitable assignee obtains, not simply a right of action against the depositary, mandatary, or debtor, but an equitable property in the fund itself, is carried out into all its legitimate consequences. Thus, the assignee may not only recover the money from the original depositary—the drawee, but may

pursue it or its proceeds under any change of form as long as it can be certainly identified, into the hands of third persons who have acquired possession of it from the depositary as volunteers, or with notice of the assignee's prior right.   The fund in this respect resembles a fund impressed with a trust." 3 Pomeroy's Eq. Juris. sec. 1280.  See, also, *Pomeroy* v. *Manhattan Life Ins. Co.* 40 Ill. 398; *National Bank of America* v. *Indiana Banking Co.* 114 id. 483.

Nor is it material that the fund upon which the draft is drawn is not due, or that it is not actually in being, if it exists potentially, for even in that case the order will operate as an equitable assignment of the fund as soon as it is acquired, and will create an interest in it which a court of equity will enforce.   3 Pomeroy's Eq. Juris. sec. 1283.

It is further urged that the order in question contravenes the provisions of a statute of the State of New York in relation to corporations, and is therefore void.   The Ohio and Western Coal and Iron Company was organized under a general statute of the State of New York, authorizing and providing for the formation of corporations for manufacturing, mining, mechanical or chemical purposes, passed February 17, 1848.   That statute contains no provision prohibiting preferences by insolvent corporations.   But there seems to be a general statute in force in that State in relation to corporations, passed in the year 1825, and which forms a chapter of the "Revised Statutes of New York passed in the years 1827 and 1828, and certain former acts which had not been revised."   That statute contains a section which provides as follows:

"Whenever any incorporated company shall have refused the payment of any of its notes, or other evidences of debt, in specie, or lawful money of the United States, it shall not be lawful for such company, or any of its officers, to assign or transfer any of the property or choses in action of such company, to any officer or stockholder of such company, directly

or indirectly for the payment of any debt; and it shall not be lawful to make any transfer or assignment in contemplation of the insolvency of such company, to any person or persons whatever; and every such transfer and assignment to such person, stockholder, or other person, or in trust for them or their benefit, shall be utterly void."

There can be no doubt that the Coal and Iron Company, at the time the draft was drawn, was in contemplation of insolvency. On that very day, or the day before, a meeting of the trustees was held in the city of New York, at which Hall the vice president was present, and at which it was determined that the company should make an assignment for the benefit of its creditors, a step which was taken very shortly afterwards. If then the New York statute above quoted is to be enforced extra-territorially, the draft must be held to be void. Should it be so enforced?

It is the charter alone which, by the law of comity is recognized and enforced in other jurisdictions, and not the general legislation of the State in which the company is formed. The general laws and regulations of a State are intended to govern only within the limits of the State enacting them, and the State can have no power to give them extra-territorial force. Such provisions do not, as a rule, enter into contracts made within the State, if they are to be performed in another jurisdiction. It follows therefore, that where a State statute is enacted for the enforcement of a local policy only, it will not be presumed that such statutory provision was intended by the State, or by the share-holders forming the corporation, to enter into the charter contract, and to regulate the company in its transactions outside of the State, and it will not affect the validity of the dealings of the company in foreign States. 2 Morawetz on Corporations, sec. 967.

In *White* v. *Howard*, 38 Conn. 342, a question arose as to the power of a New York corporation to take a devise in the State of Connecticut, devises to corporations being forbidden

by the New York Statute of Wills. The court, in sustaining the devise, said: "If the inability to take by devise arose out of a prohibitory clause in the charter, the conclusion contended for would be legal and logical. But the inability does not so arise. There is no prohibition in the charter; the inability is created by the New York Statute of Wills, expressly excepting corporations from taking by devise. Now this corporation brings with it from New York its charter, but it does not bring with it the New York Statute of Wills, and can not bring it to be recognized as law within this jurisdiction. There is an obvious distinction between an incapacity to take created by the statute of a State, which is local, and a prohibitory clause in a charter, which everywhere cleaves to the corporation."

In *Ellsworth* v. *St. L., A. & T. H. R. R. Co.* 98 N. Y. 553, the corporation in question was organized under the laws of Illinois, and the point in dispute was whether a provision in its charter prohibiting it from selling its bonds at less than eighty cents on a dollar, would apply, as a statutory provision, to a sale made in the State of New York. In deciding this question in the negative, the court said: "There is nothing in the laws of New York which renders the contract illegal; even if the charter of the defendant should be so construed as to contain prohibitions which would have rendered the contract illegal in Illinois, if made there, they do not have that effect in this State."

In *Hoyt* v. *Sheldon*, 3 Bosw. 267, the charter of a corporation created by the laws of New Jersey, contained no prohibition upon the disposition of its property in case of insolvency. A general statute of the State, however, prohibited incorporated companies, after becoming insolvent or in contemplation of insolvency, from selling, assigning or transferring any of their property or effects, and declared all such sales to be utterly null and void as against creditors. The question was as to whether the title of a citizen of New York, derived through

a transfer of a portion of its property by such corporation, the transfer being made outside of New Jersey, was affected by such prohibition. The court, in deciding that question in the negative, held that the power of disposing of its property was one of the powers incident to corporate existence, and was not destroyed by insolvency, unless so expressly provided in the act of incorporation, and that a citizen of New York dealing with a New Jersey corporation, might rely upon the act of incorporation, and was not chargeable with notice of the general laws of New Jersey restraining the powers of corporations. See, also, *National Bank of America* v. *Indiana Banking Co.* 114 Ill. 493; *Hoyt* v. *Thompson*, 19 N. Y. 207.

In view of these authorities, and of many others of like character which might be cited, we are of the opinion that the general statute of New York prohibiting the assignment or transfer of property by a corporation in contemplation of insolvency, is only a part of the local law of that State which New York corporations organized under the act of 1848 do not carry with them when they go to other jurisdictions to do business, and that having no extra-territorial force, it has no application to an assignment of a fund in Illinois, executed in Ohio, by a New York corporation.

In *Starkweather et al.* v. *American Bible Society*, 72 Ill. 50, it was held that a New York corporation could not exercise a power in this State which was denied to it by the general statutes of the State of its creation, and to that extent the rule in this State must be held to be in conflict with that laid down in *White* v. *Howard*, *supra*. We are aware of no decision in this State, however, which holds that the local statutes of another State regulating the mode in which corporate powers shall be exercised, or determining the validity of corporate acts performed in the exercise of such powers, are to be given any extra-territorial effect.

But it is contended that, even if the draft in question is not affected by the New York statute, it should, under the circum-

stances, be held to be void on general principles of equity. The theory upon which this contention rests is, that the assets of a corporation, the instant the corporation becomes insolvent, become a trust fund for the benefit of its creditors, and that the officers of the corporation in possession of the corporate property, being trustees for all the creditors, can not lawfully dispose of it otherwise than for the equal benefit of all the corporate creditors. In support of this view, the case of *Rouse* v. *Merchants' National Bank*, 46 Ohio St. 493, is referred to, and this decision, among others, was read in evidence at the hearing, for the purpose of showing as a matter of fact the conclusion adopted by the highest court of the State of Ohio in relation to the equitable rule contended for. It is there held, that a corporation organized for profit under the laws of Ohio, after it has become insolvent and ceased to prosecute the business for which it was created, can not, by giving some of its creditors mortgages to secure antecedent debts, without other consideration, create valid preferences in their behalf over other creditors, or over a general assignment thereafter made for the benefit of creditors. The court, in the opinion, recognizes the fact that the decisions on the question in the other States are conflicting, and admits that it is a matter of first impression in that court.

In this State, however, where the fund assigned had its *situs*, where the drawee resided, and where the order, as the parties must have contemplated, was to be executed, a somewhat different rule prevails. The doctrine is recognized here that the property of an insolvent corporation is a trust fund in such sense as precludes the directors and officers of the corporation from dealing with it in such manner as to secure preferences for themselves. *Roseboom* v. *Whittaker*, 132 Ill. 81; *Beach* v. *Miller*, 130 id. 162. But we have not gone so far as to hold that the mere insolvency of a corporation *eo instanti* deprives the directors and officers of the power to dispose of the corporate property, in good faith, by way of paying or

securing corporate debts, even though the result may be, to give certain creditors a preference over others.

In *Reichwald* v. *Commercial Hotel Co.* 106 Ill. 439, a corporation organized under the laws of Iowa and doing business in this State, being insolvent, turned out a part of its property in payment of one of its creditors, and it was held that a corporation, like a natural person, in the absence of any positive law to the contrary, may turn out a part or the whole of its property in payment of its debts, and in so doing, may prefer creditors, if done in good faith, and not for a fraudulent purpose. In *Ragland* v. *McFall,* 137 Ill. 81, the question arose between a judgment creditor of an insolvent corporation and a creditor to whom the corporation had turned out a portion of its property in payment of that creditor's claim, and such disposition of the corporate property was sustained, the decision in *Reichwald* v. *Commercial Hotel Co. supra,* being cited and approved. In *Glover* v. *Lee,* 140 Ill. 102, creditors of an insolvent Iowa corporation brought suit against it by attachment and caused certain insurance companies to be summoned as garnishees. A creditor to whom the insolvent corporation had assigned the policies of insurance sought to be reached by the garnishment proceeding, intervened and set up title under such assignment, and this court, in affirming a judgment in favor of the intervenor, said: "The mattress company had an undoubted right to pay any and all of its creditors any debt which it justly owed, or it might secure a creditor. Here the policies were in good faith transferred to the bank, a creditor, with the approval of the insurance companies, before any other creditor acquired any lien or took any steps to reach the assets of the mattress company, and we are aware of no principle which would prevent the bank from securing its debt in the mode adopted."

In Cook on Corporations, the rule is laid down as follows : "Corporations, unless restricted by their charters, or by general statutes, may make assignments for the benefit of cred-

itors to the same extent that individuals may. In making the assignment, the corporation may make preferences for one or more creditors over others, or of one class of creditors over other classes. A preference by the directors of themselves is generally held to be fraudulent.", Cook on Corp. sec. 691, and see authorities collected in notes.

Our conclusion then is, that the order drawn by Stanwood on the Pullman Company in favor of the bank was valid, and that it vested in the bank a first lien upon the funds in the hands of the Pullman Company, if, under the evidence, it can be held that that fund at the time belonged to the Coal and Iron Company and was subject to its disposition. And this brings us to a consideration of the claim of Glidden & Curtis, now represented by the trustees of that firm.

The contention is, that Glidden & Curtis were the general selling agents of the Coal and Iron Company, and as such had advanced to that company large sums of money, for which the company, at the time of its failure, was indebted to them in the sum of nearly $400,000, and that they had a first lien on the fund in the hands of the Pullman Company for the payment of that indebtedness.

It appears that in March, 1887, the company, being in need of money, adopted a resolution authorizing its treasurer to execute a contract with Glidden & Curtis to advance money for the use of the company, upon such terms as should be approved by certain officers of the company, and that it also at the same time adopted a resolution appointing Glidden & Curtis "fiscal and general selling agents of the company." Glidden & Curtis thereupon loaned to the company $300,000, and took as security $400,000 of its bonds, with the option to purchase the bonds, within a certain time, at seventy-five cents on a dollar, an option which was duly exercised. The indebtedness created by this loan however forms, as it seems, no part of the indebtedness for which the lien is now claimed. Afterwards, on the 3d day of November, 1887, a written con-

tract between the company and Glidden & Curtis was exe-cuted, the material portions of which were as follows:

"Whereas, by a vote of the trustees of said company, the said firm of Glidden & Curtis were duly appointed fiscal and general selling agents of said corporation: Now, therefore, it is hereby agreed by and between the said corporation and the said firm, that the said agency shall be carried on and conducted upon the following agreements and conditions, to the faithful performance of which, they, the said corporation and the said firm, mutually bind themselves, each to the other, its successors and assigns, firmly by these presents.

"First: The said firm are to sell or supervise and control all sales of said corporation's articles and products, and they are to furnish advances on said corporation's products accord-ing to its needs, to such an extent as they shall consider them-selves safely secured therefor at current rates of interest and exchange, and they are to render accounts of sales monthly to said corporation, and charge their commissions at the rate of ten cents per ton on the sales of coal, and two and one-half per cent on sales of iron.

"Second: All articles and products of the said corporation are to be and are hereby consigned to said firm.

"Third: This contract is to continue for five years from the thirty-first day of October, 1887."

This contract was executed on behalf of the corporation by James A. Hall, vice president, and consent to its execution seems to have been given by a large majority of the stock-holders, but it does not appear to have been authorized by the trustees of the corporation.

Glidden & Curtis, after being appointed general selling agents, appointed Walter C. Wyman their agent at Chicago to sell coal. There is very considerable evidence, however, both direct and circumstantial, tending to show that Wyman acted also as agent of the Coal and Iron Company. But the busi-ness of his agency seems to have been conducted substantially

as follows:   Coal was shipped by the company to him, or, as was most generally the case, directly to the parties to whom he had sold it, and he collected the money therefor and remitted it to Glidden & Curtis.   He had on his office door the following sign:   "Ohio and Western Coal and Iron Company, Walter C. Wyman, Agent," and the name of the company was also printed on his letter-heads.   Where the coal was shipped directly to the purchaser, the only document issued to Wyman was an instrument called a "Manifest of Mine Shipments," made out by employes of the Coal and Iron Company, at the mines, which was in the nature of a letter of advice, containing a statement of the date, nature, and amount of the shipment, the name of the railroad by which the shipment was made, the number of the cars, and the name of the purchaser who was therein designated as consignee, and the printed heading of which was as follows:   "From the Ohio and Western Coal and Iron Company to Glidden & Curtis, General Selling Agents.   Walter C. Wyman, Manager Sales Department."   These instruments seem to have borne no signature.   On the 26th day of November, 1888, the following agreement was entered into between the Coal and Iron Company and the Pullman Company:

"CHICAGO ILL., *November 26, 1888.*
"*Pullman's Palace Car Co., Chicago, Ill.:*

"Gentlemen—The Ohio and Western Coal and Iron Company (for convenience hereinafter called the coal company) hereby proposes to furnish you with coal of the kind and quality hereinafter mentioned, for steam and hammer shop purposes, at your works at Pullman, Illinois; until June 1, 1889, the coal to be of the best Ohio XX Shawnee, uniform in quality, and free from dirt, stone, slate and other impurities, and subject to inspection and approval of your representative at Pullman, at the following prices, f. o. b. cars at Pullman Junction, Illinois.:   One and one-quarter ($1\frac{1}{4}$) inch screened lump, three dollars ($3) per ton; three-quarters ($\frac{3}{4}$)

inch screened lump, two dollars and ninety-five cents ($2.95) per ton; screened nut, two dollars and sixty-five cents ($2.65) per ton. Payment to be made for the coal delivered in each month, in cash, namely, on your regular pay day, the 15th day of the second month following the deliveries.

"It is the intent and meaning of this agreement that the coal company shall, at all times, supply coal of proper quality and in sufficient quantities to fully meet your current requirements and under all contingencies, and also for at least ten days beyond your current needs; and whenever it shall partially or wholly fail to do so, or whenever you shall have reason to believe it will fail to do so, then it is understood and agreed that you shall have the right, in anticipation of such failure, to purchase in the market the required quality and quantity of coal necessary for your use, and to charge to the coal company any sum that the cost of such coal is in excess of the prices herein agreed upon, which the coal company agrees to pay you.

"It is also understood and agreed that the above prices shall also apply to all coal that the coal company has furnished you since the completion of the delivery of coal under contract between our respective companies, dated November 7, 1887, and that the coal company shall refund to you the amount you have paid it in excess of the prices above named during said period.

"It is further agreed, that in the event the freight rates on the coal furnished under this contract between the coal mines of this company and Pullman Junction shall, at any time during the continuance of this agreement, be less than $2 per ton of 2000 pounds, this company will at once notify you of such fact, and from the date of such reduction, and so long as it may continue, you will be entitled to a credit on the price of each ton of coal furnished, equal to the difference between such reduced rate and the rate of $2 per ton.

"Your written acceptance of this proposition will make the contract mutually binding upon both companies hereto.

"Executed in duplicate.

THE OHIO AND WESTERN COAL AND IRON CO.,
By W. C. WYMAN.

"Approved.              JAMES A. HALL, *Vice Pres.*

"Accepted.              PULLMAN'S PALACE CAR CO.,
By GEO. F. BROWN, *Gen. Manager.*"

After the execution of this agreement, the coal sold and delivered thereunder was shipped by the Coal and Iron Company from its mines in Ohio to the Pullman Company at Pullman, Illinois, the Pullman Company or one of its agents being in all cases named as the consignee, and the contract price was credited by that company on its books to the Coal and Iron Company. The indebtedness thus created, prior to that in controversy here, seems to have been collected from the Pullman Company by Wyman, and by him remitted to Glidden & Curtis. But at the time the order in favor of the First National Bank of Columbus was drawn, no attempt, so far as appears, had been made by Wyman to collect of the Pullman Company the accounts for coal maturing February 15 and March 15, 1889, and the question is, whether, under the facts proved, Glidden & Curtis had such a claim to or lien upon those accounts as precluded the Coal and Iron Company from appropriating or assigning them for the purpose of paying or securing the $20,000 loan.

The claim is now made that the form in which the instrument of November 26, 1888, above set forth, purporting to be an agreement between the Coal and Iron Company and the Pullman Company was executed was a mistake; that it was drawn up by the Pullman Company, and that when presented to Wyman to be executed, the type-written signature of the Coal and Iron Company was already at the bottom of it, and that Wyman hastily and unadvisedly executed the instrument by adding his own signature to that of the company already

type-written, although it was his intention to execute it on behalf of Glidden & Curtis, and that it should be treated as the contract of Glidden & Curtis, and not that of the Coal and Iron Company.

It will be noticed that the mistake, if there was one, was not in the signature alone, but that it pervades the entire instrument. The Coal and Iron Company is named and referred to throughout as one of the contracting parties, and Glidden & Curtis are not referred to, either as principals, factors, selling agents, or in any other relation, and their signature to the instrument, without further explanation, would have been unmeaning. Even if it were admissible to change the legal effect of a written instrument by parol evidence, as is attempted to be done, proof that there was a mistake in the mode of signing comes quite short of obviating the difficulties which the tenor of the instrument presents. To accomplish the result contended for, the entire agreement must be reformed, and that too in such a way as to make it an agreement between other parties, and even if that could be done by parol, there is no evidence in the record, so far as we are advised, upon which such reformation could be based. We see no sufficient ground for holding that this instrument was not executed precisely as it was intended to be, and that, so far as it goes, it does not truly represent the transactions and relations of the parties to which it applies.

If then Glidden & Curtis were entitled to or had a lien upon the money due from the Pullman Company for coal February 15 and March 15, 1889, upon what was that right based? We are unable to see how it could result from the terms of the contract of November 3, 1887, except so far as that contract must be deemed to recognize the lien which the common law gives to factors upon the goods consigned to them for sale, and upon the proceeds thereof when sold. The only provision in the contract having any bearing upon the question is the one by which Glidden & Curtis agree "to furnish advances on

said corporation's products, according to its needs, to such extent as they shall consider themselves safely secured therefor, at current rates of interest and exchange." How this security was to be effected is not stated, but the contract provides for a consignment of the products of the Coal and Iron Company to Glidden & Curtis for sale on commission, thus constituting them the factors of the company, and it is left to be inferred that the security intended is the one which the law gives to factors. In no other way does the contract assume to pledge the products of the Coal and Iron Company as security for such advances as Glidden & Curtis might make under it.

This branch of the case then is reduced to the single inquiry whether, under the circumstances shown by the evidence, Glidden & Curtis were entitled to a factor's lien upon the particular coal sold to the Pullman Company, and for which the indebtedness now in question accrued, or upon the proceeds of the coal after it was sold. Doubtless if their agent had collected this money of the Pullman Company, as he had the moneys due for previous sales, so as to get it into their possession or that of their agent before third parties had acquired liens upon it, they would have been entitled to hold it and apply it in satisfaction of their advances to the Coal and Iron Company. But that was not done. Were they entitled to a lien as factors?

By the common law, a factor has a general lien upon all the goods of his principal in his possession, and upon the price of such as are lawfully sold by him, and upon the securities received therefor, to secure the payment of the general balance of the accounts between himself and his principal, as well as for the advances, charges and disbursements made upon or in reference to the particular goods. Mechem on Agency, sec. 1032; 3 Am. & Eng. Encyc. of Law, 333. But to obtain such lien the factor must have the goods lawfully in his possession. 3 Am. & Eng. Encyc. of Law, 335. Actual

possession is of course sufficient, and delivery to the factor's own servant or agent will suffice. So putting the goods upon the factor's dray to be drawn to his warehouse is a sufficient delivery. Mechem on Agency, sec. 1032. Some of the authorities go further and hold that, where before the goods have come into the possession of the factor, he has made advances upon them, or incurred liabilities in respect thereto, potential or constructive possession is sufficient. Bishop on Contracts, sec. 1140. Thus while some of the cases hold that his lien will not attach until the goods are actually in his possession, others maintain the doctrine that, where advances have been made in reliance upon a promise to subsequently consign the goods, a delivery to a common carrier consigned to the factor is sufficient. *Elliot* v. *Cox,* 48 Ga. 39 ; *Hardeman* v. *DeVaughn,* 49 id. 596 ; *Wade* v. *Hamilton,* 30 id. 450 ; Mechem on Agency, sec. 1035.

But no cases can be found, we think, which hold that the factor's lien can attach to goods which have never come into his actual possession, and have never been consigned to him, but which have been delivered or consigned by the owner directly to the purchaser. In such case, the possession of the factor, if indeed as to such goods he can be called a factor, is not actual nor is it constructive or potential. The goods do not come into his possession or under his control, nor is it within the contemplation of the parties that they should do so. The principal yields possession directly to the purchaser, and no possession of the goods or control over them by the factor intervenes.

Such seems to have been the precise condition of things in the present case. The coal was all consigned by the Coal and Iron Company directly to the Pullman Company or its agent, and it never came into either the actual or constructive possession of Glidden & Curtis. True there was an agreement on the part of the Coal and Iron Company to consign all of its products to them for sale, but a mere agreement to con-

sign does not operate as a consignment. If the agreement was broken in this respect, Glidden & Curtis had their remedy for a breach of contract, but it was only through the actual performance of the agreement that their factor's lien could arise.

If it be admitted that Wyman, in executing the contract of November 26, 1888, between the Coal and Iron Company and the Pullman Company, acted in fact as the agent of Glidden & Curtis, and that the contract is to be treated as though executed on behalf of the Coal and Iron Company by Glidden & Curtis, their relation to the Coal and Iron Company in executing that contract would seem to be that of brokers rather than that of factors. That contract clearly contemplated the consignment of the coal to be delivered under it directly to the Pullman Company and not to Glidden & Curtis, and the mode in which the contract was afterwards carried out as clearly indicates that such was the understanding of the parties. One of the essential differences between a factor and a broker is, that while the former has the possession of the goods to be sold, the latter has not, and it therefore follows that the common law lien, which necessitates and grows out of possession, is given to the former but is denied to the latter.

We are of the opinion then, that under the facts, as shown by the evidence, Glidden & Curtis had no lien upon the fund in question in this suit. The lien of the bank became perfected by notice to the Pullman Company before any other lien attached, and their claim must therefore be paid first, with interest. After its payment, the residue of the fund should be distributed among the four attachment creditors above named in the order of priority fixed by the statute.

The decree of the Circuit Court, and the judgment of the Appellate Court will be reversed, and the cause will be remanded to the Circuit Court, with directions to enter a decree as above stated.

*Judgment reversed.*