### CHEMICAL NAT. BANK v. ARMSTRONG.[1]

(Circuit Court of Appeals, Sixth Circuit. November 13, 1893.)

No. 56.

1. BANKS—MISCONDUCT OF OFFICER IN BORROWING MONEY—LIABILITY OF BANK.
    A bank is liable for a loan obtained from another bank, dealing in good faith with its authorized officer, although such officer acts without the knowledge of the other bank officials, and appropriates the money to his own use.

2. NATIONAL BANKS—INSOLVENCY AND RECEIVERS — ALLOWANCE OF CLAIMS — COLLATERAL.
    Creditors of an insolvent national bank cannot be required, in proving their claims, to allow credit for any collections made after the date of the declared insolvency from collateral securities held by them. 50 Fed. 798, reversed.

3. SAME—DIVIDENDS—INTEREST.
    Interest on dividends should not be allowed in favor of one who voluntarily delayed presenting his claim until long after the dividends were declared, although the delay was due to a mistaken belief that he had a right to pay his claim in full from collaterals in his hands.

4. SAME.
    The refusal of a creditor to accept the receiver's offer to allow part of a claim without prejudice to a suit for allowance of the remainder, or to the receiver's right to still further reduce the claim if the court should hold such reduction proper, bars the creditor's right to interest on subsequent dividends on the part offered to be allowed, although it is subsequently adjudged that the whole of his claim should have been allowed; but he is entitled to interest on the dividends on the part rejected.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

In Equity. Bill by the Chemical National Bank of the city of New York against David Armstrong, receiver of the Fidelity National Bank of Cincinnati, Ohio, to establish a claim against that bank. Decree for complainant. 50 Fed. 798. Both parties appeal. Reversed.

William Worthington, for Chemical Nat. Bank.
John W. Herron, for David Armstrong, receiver.

[1] Rehearing granted.

Before BROWN, Circuit Justice, and TAFT and LURTON, Circuit Judges.

TAFT, Circuit Judge. These are cross appeals from a decree of the circuit court for the southern district of Ohio directing the receiver of the insolvent and defunct Fidelity National Bank of Cincinnati to allow a claim of the Chemical National Bank of New York against the assets in his hands for $205,450. The Chemical Bank, the complainant below, objects to the decree on the ground that the claim should have been allowed for $300,000 and interest, while the receiver objects to the decree because the claim as allowed was not reduced by about $10,000.

On March 2, 1887, the Chemical Bank placed to the credit of the Fidelity Bank $300,000, the proceeds of a call loan, as collateral for which a number of bills receivable had been pledged. E. L. Harper, vice president of the Fidelity Bank, who secured the loan, directed that this credit be transferred on the books of the Fidelity Bank to his individual account. This was done, and the money was checked out by Harper.

On June 21, 1887, the Fidelity Bank suspended payment. Its doors were closed by order of the comptroller of the currency upon that day, and on the 27th of the same month, the comptroller appointed the defendant, Armstrong, its receiver. None of the collaterals on the $300,000 loan had been collected by the Chemical Bank before the receiver took possession of the Fidelity Bank. Subsequently three notes made by J. W. Wilshire, and indorsed by John V. Lewis, for $25,000 each, which were among the collaterals for the $300,000 loan, were collected by the Chemical Bank; and another note, having the same maker and indorser, for another $25,000, could have been collected, had the Chemical Bank not been negligent in failing to demand payment and to notify the indorser, for, though Wilshire the maker was insolvent, Lewis the indorser was able to pay. The Chemical Bank had made other advances to the Fidelity Bank upon which it had received other collateral. In the belief that it was entitled to use all the collateral in its hands to pay all the obligations of the Fidelity Bank to itself without regard to the particular loans upon which particular collateral had been deposited, the Chemical Bank had gone on making collections, and had applied the proceeds of the collateral indiscriminately to the aggregate debt, so that it had paid the entire indebtedness of the Fidelity Bank owing to it, and had on hand a balance of $33,000, which it turned over to the receiver. The receiver objected to the "massing" of the collateral, and insisted that the Chemical Bank could not use collateral, given to secure one obligation, to pay another. This resulted in litigation, in which the receiver was successful, and obtained $286,000 from the Chemical Bank.

And so it happened that on the 25th of April, 1890, and not until then, the Chemical National Bank presented its claim $300,000 on the loan already referred to. The receiver objected to the claim, on the ground that $75,000 which the bank had collected on the collateral before proving its claim, and about $9,000 thereafter col-

lected, and the $25,000 which, through its negligence, it had failed to collect, should be credited on the claim.

The answer of the receiver made the defense that the Fidelity Bank could not be held liable for the $300,000 loan, because Harper had negotiated it without the knowledge of the other officers of the bank, and had fraudulently appropriated the proceeds of the loan to his own uses. The defense has not been pressed on us by counsel for the receiver, and certainly cannot be sustained. The evidence is undisputed that the Chemical National Bank had no knowledge that Harper was engaged in defrauding the Fidelity Bank, and dealt with him as an authorized officer of that bank, and the money was placed to its credit. The debt was, therefore, the debt of the Fidelity Bank.

The next question is, shall creditors of an insolvent national bank, in proving their claims, be required to allow any credit for collections from collateral made subsequent to the declared insolvency, and before proof of claim? If so, shall the claims as proven be also subsequently reduced by collections from collateral made, after proof, and before dividends are declared, thus varying the basis of distribution from dividend to dividend? Or shall the rule in bankruptcy be followed, by which the creditor holding collateral shall be required to reduce his claim by the actual collections and the estimated value of his uncollected collateral?

The court below held that the creditor should be required to allow a credit of all collections made before filing his proof of claim, but not of those made thereafter. The receiver contends that the rule in bankruptcy is the proper one, while the complainant bank maintains that it should be allowed to prove its claim as it existed at the moment of declared insolvency.

It is singular that in the years during which the national banking act has been in force the foregoing questions have not been settled by a decision of the supreme court. It is, for the federal courts, a new and important question, and has received at our hands the consideration it deserves. We have been greatly assisted by the elaborate and able written and oral arguments of counsel for both parties, in which all the many decided cases presenting the same or analogous questions have been industriously reviewed and discussed.

By section 5234, Rev. St., and section 1 of the act of June 30, 1876, (19 Stat. 63,) it is made the duty of the comptroller of the currency to appoint a receiver to wind up a national banking association whenever the comptroller shall, after examination, have become satisfied of its insolvency. It is the duty of the receiver thus appointed to take possession of the books and effects of the bank, liquidate its assets, and pay the money thus realized into the treasury of the United States.

Section 5235 makes it the duty of the comptroller thereupon to give notice by public advertisement for three months, calling on all persons having claims against the association to present the same, and to make legal proof thereof.

Section 5242 declares void all transfers of its property by the national bank after the commission of the act of insolvency, or in contemplation thereof, to prevent distribution of its assets in the manner provided in said national banking act, or with the view to prefer any creditor, except in payment of its circulating notes. And it further provides that no judgment or injunction shall be issued against the bank or its property before final judgment in any suit, action, or proceeding in any state, county, or municipal court.

Section 5236 provides that, after making full provision for the redemption of the circulating notes of the association, "the comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated, and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association or their legal representatives in proportion to the stock by them respectively held."

The suspension of the bank, and its seizure by the comptroller and his appointee, the receiver, work, by operation of law, a transfer of the title to the assets of the bank from the bank to the comptroller and receiver, in trust to reduce the assets to money, and apply them, as directed by the national banking act—first, to the redemption of the circulating notes of the bank; and, second, in ratable distribution to the creditors of the bank. Scott v. Armstrong, 146 U. S. 499, 13 Sup. Ct. 148; White v. Knox, 111 U. S. 784, 4 Sup. Ct. 686.

It is manifest that it would utterly defeat the object of the banking act if, after the suspension, the assets remained subject to levy, execution, or attachment and, therefore, that the passing of the assets into the hands of the receiver removes all the property of the bank from liability to process to secure satisfaction of judgments. Bank v. Colby, 21 Wall. 609.

The right which a creditor of the bank had before suspension of levying an execution to satisfy his judgment is gone, and for it is substituted a fixed and definite interest in the assets as a security for the payment of his debt, which it is the purpose of the banking act to reduce to money, and apply on his debt, with all convenient speed. We see no reason why this does not apply as well to creditors who hold collateral as to those who are unsecured. It is well settled that the holding of collateral does not prevent a creditor from enforcing his claim in the ordinary way by judgment and execution against a debtor without any deduction for his collateral. Lewis v. U. S., 92 U. S. 618.

When the secured creditor is required by the transfer of the assets in trust for winding-up purposes to forego his right to satisfy his entire debt out of the property of the bank by levy and execution, why should there be substituted for that right anything less than that which the unsecured creditor gains by yielding up the same right? Take the case of two creditors of the bank for $1,000 each, one with collateral and the other unsecured. Before suspension, the one has

two modes of collecting his debt—first, by levy and execution for $1,000; and, second, by reducing and applying the collateral. The other has but one,—that of a levy and execution for $1,000. When the bank suspends, the unsecured creditor acquires, in exchange for his right to levy on the property of the bank to make $1,000, an undivided interest in the assets held by the receiver, after the circulating notes are paid, which bears the same ratio to the entire assets of the bank as $1,000 does to the entire indebtedness. If so, why should not the secured creditor, who, before the suspension, had also the right to make $1,000 by levy on the property of the bank, receive the same ratable interest in the assets held by the receiver? The suspension of the bank, and its seizure by order of the comptroller, have no effect to change the rights of the creditor with reference to his collateral. He enjoys precisely the same advantage over the unsecured creditor, with respect to the collateral, that he did before the suspension. With reference to obtaining satisfaction out of the general assets of the bank before suspension, their rights were equal. So must their rights be, after the sequestration of the assets for ratable distribution. Illustrations are put to show the injustice of the view we are advocating. A. has a claim of $1,000 against the bank, for which he holds bonds, worth $500, as security. B. has a claim of $500. A dividend of 50 per cent. is declared, and A. receives $500 on his claim, leaving $500 due, which he subsequently satisfies out of the collateral. A. is thus paid in full, while B. receives but $250. Now, it is said that A., who had a claim of $500, which was unsecured, has had his unsecured claim paid in full, while B., who also had an unsecured claim for the same amount, has only received $250, which must be unjust and inequitable. The fallacy in this argument is in assuming that A. had an unsecured claim for $500. He had a claim for $1,000, secured by $500 of collateral, all of it applicable to every dollar of the debt. No part of the debt was unsecured. The same thing was true of his interest in the assets of the bank. That was applicable to every dollar of the $1,000. He had two securities for the payment of his debt, one of which he held in common with all the creditors, the other of which he had obtained by lawful contract from his debtor. It is a rule of equity that, where a creditor holds two securities, one of which he has in common with others, and the other of which he holds for his sole use, he may be required to collect his debt first out of the security for his sole benefit, so that those who hold in common with him may have more to apply to their debts. But this rule can never be invoked where he who has the two securities cannot pay himself in full out of both. He was given the two securities to pay his debt, and he cannot be deprived of this primary equity for the benefit of some one else who is less fortunate in his security. 3 Pom. Eq. Jur. § 1414; Story, Eq. Jur. § 564b.

The national banking act was framed to secure equality of distribution among the creditors, so far as is consistent with the previous contract rights of those creditors. If one creditor secured collateral for his loan when made, that produced an inequali-

ty between him and the other creditors who have no collateral which it cannot have been the purpose of the banking act, in its provisions for winding up the insolvent bank, to modify, reduce, or defeat.

It is true that under the bankruptcy act it was provided that a secured creditor, if he would prove for his full claim, must surrender his collateral, or else be content to prove for the difference between his full claim and the value of his collateral. Rev. St. § 5075. The bankruptcy law is not now in force, however, and it was expressly held in the case of Cook County Nat. Bank v. U. S., 107 U. S. 445, 2 Sup. Ct. 561, that the priorities and method of distribution under the bankrupt law had no application to the winding up of insolvent national banks. It was said that the national banking act contained within itself a complete system for distributing the assets and determining the priorities, and that a priority secured to the United States under the bankrupt law would not be enforced in their favor under the banking act. In delivering the opinion of the court, Mr. Justice Field, referring to the bankruptcy law, said: "That enactment was dealing with the estates of persons adjudged to be insolvent under that law, and covers only the distribution of their estates. It has no further reach."

The rule in bankrupty was not the rule in equity, because it ignored the rights belonging to the secured creditor before the bankruptcy took place, and materially modified and reduced the advantage over unsecured creditors which, in the original contract of pledge, the debtor had intended to secure him.

The question we are discussing is one which has arisen in determining the proper ratable distribution of assets under nearly all acts for the settlement of insolvent estates and for the winding up of insolvent corporations.

In Massachusetts, (Amory v. Francis, 16 Mass. 309,) in Iowa, (Wurtz v. Hart, 13 Iowa, 515,) in South Carolina, (Wheat v. Dingle, 32 S. C. 473, 11 S. E. 394,) and in Washington, (In re Trasch, 31 Pac. 755,) it was held that the rule in equity is the same as the rule in bankruptcy, and that the secured creditor can prove only for the balance of his debt after the collateral shall have been applied. It was so held by Sir John Leach, master of the rolls, in Greenwood v. Taylor, 1 Russ. & M. 185. In Amory v. Francis, supra, Chief Justice Parker repudiates the view that the secured creditor should be allowed to prove for his full claim, without deduction for collateral, on the ground that he "would in fact have a greater security than that pledge was intended to give him; for, originally, it would have been security only for a proportion of the debt equal to its value; when, by proving the whole debt, and holding the pledge for the balance, it becomes security for as much more than its value as is the dividend which may be received on the whole debt." With much deference to the great jurist who advanced this argument, we think that it quite incorrectly states the effect of the contract of pledge, which is that the collateral shall be security for the whole debt, and every part of it, and therefore is as applicable to any balance which remains after payments from other sources as to the

original amount due. The view of the supreme judicial court of Massachussetts was adopted into a statute which deprives the subsequent cases in that state of much bearing upon the question before us. The other cases cited, and especially Greenwood v. Taylor, seem to rest on the rule in equity requiring a creditor with two funds as security, one of which he shares with others, to exhaust his sole security first. As already said, the rule has no application when its operation would prevent the creditor from paying his whole claim.

The great weight of authority in England and this country is strongly opposed to the view that a creditor with collateral shall be thereby deprived of the right to prove for his full claim against an insolvent estate. Greenwood v. Taylor was questioned by Lord Cottenham in Mason v. Bogg, 2 Mylne & C. 443, 448, and was expressly repudiated as authority in the court of chancery appeals in Kellock's Case, 3 Ch. App. 769,—a case which, upon this point, is cited with approval in Lewis v. U. S., 92 U. S. 618. In this country, the Massachusetts doctrine was dissented from by the supreme court of New Hampshire in the early case of Moses v. Ranlet, 2 N. H. 488. Other cases which fully support the views we have expressed are: People v. E. Remington & Sons, 121 N. Y. 336, 24 N. E. 793; In re Bates, 118 Ill. 524, 9 N. E. 257; Findlay v. Hosmer, 2 Conn. 350; Logan v. Anderson, 18 B. Mon. 114; Bank v. Patterson, 78 Ky. 291; Brown v. Bank, 79 N. C. 244; Kellogg v. Miller, 22 Or. 406, 30 Pac. 229; Miller's Estate, 82 Pa. St. 113; Graeff's Appeal, 79 Pa. St. 146; Patten's Appeal, 45 Pa. St. 151; Miller's Appeal, 35 Pa. St. 481; Allen v. Danielson, 15 R. I. 480, 8 Atl. 705; Bank v. Haug, 82 Mich. 607, 47 N. W. 33; West v. Bank, 19 Vt. 403. Compare, also, Kortlander v. Elston, 2 C. C. A. 657, 52 Fed. 180; Bank Cases, 92 Tenn. 437, 21 S. W. 1070.

The exact point which is common to all the foregoing authorities, and which they all sustain, is that a creditor who has proved his claim against an insolvent estate under administration can collect his dividends without any deduction from his claim as proven for collections made from collateral after his proof of claim is filed. There is one authority, and only one, which upholds the view that a creditor who has once proved his claim shall reduce that claim by all collections made before the declaration of each dividend, on the theory that he is entitled to a ratable distribution on his debt as it is at the time of distribution, and the collections made after proof of claim and before each dividend must reduce the debt pro tanto. This authority is Bank v. Lanahan, 66 Md. 461, 7 Atl. 615. The argument ab inconvenienti would weigh strongly against following this case, even if its conclusion were not wrong in principle. The rule it lays down would require a readjustment of the basis of distribution at the time of declaring every dividend, and would involve endless labor and confusion. But the rule cannot be sustained, because its adoption proceeds on the theory that the claim of the creditor in reference to the sequestered assets of the debtor and the debt against the debtor are and continue to be one and the same thing. This is a fundamental error. The amount

of the claim as proven is a mere measure of the creditor's right and interest in the fund realized from the assets. The claim as proven is a claim in rem, and not in personam. This may be illustrated in respect to interest. As against the insolvent bank the debt of the creditor continues to bear interest. As against the assets, interest is calculated only to the date of the suspension and the vesting of the title of the assets in the receiver. White v. Knox, 111 U. S. 784, 4 Sup. Ct. 686; Richmond v. Irons, 121 U. S. 27, 64, 7 Sup. Ct. 788; Warrant Finance Co.'s Case, 4 Ch. App. 643; In re Joint-Stock Discount Co., 5 Ch. App. 86.

It is true that if the assets are more than sufficient to pay all debts, then the creditors are allowed dividends to pay the interest due from the debtor bank, (National Bank of Commonwealth v. Mechanics' Nat. Bank, 94 U. S. 437;) but in the measuring of the share of each creditor in the fund, interest beyond the date of suspension is not calculated. It will not do to say that the date fixed for stopping of interest on all claims is a mere matter of convenience in calculation, which works no injury to any one, because all are treated alike. The creditor with a debt bearing 8 per cent. interest is very injuriously affected in comparison with the creditor whose debt bears but 4. The contract of the former against the debtor entitled him to double the compensation for delay in payment which the latter was to receive, and yet in the distribution of the assets, for which they both may have to wait several years, the former has no advantage over the latter. If the ratable share of creditors in the assets must vary with the increase or decrease of the debt against the debtor, the refusal to allow interest on claims beyond the date of suspension would be a gross injustice to those who are entitled by contract to the higher rates of interest. The only principle upon which the rule adopted by the supreme court in White v. Knox, 111 U. S. 784, 4 Sup. Ct. 686, and by the court of chancery appeals in Warrant Finance Co.'s Case, 4 Ch. App. 643, can be supported is that, upon the transfer of the assets by operation of law to a trustee for creditors, the rights of creditors in the assets are fixed, and are to be determined as of that date, and are not affected by what may subsequently affect the debt by reason of which they acquire their interest therein, subject always to the limitation that the amount to be received by them from all sources shall not exceed their original debt and interest. Said Chief Justice Waite in White v. Knox, supra:

"The business of the bank must stop when insolvency is declared. Rev. St. § 5228. No new debt can be made after that. The only claims the comptroller can recognize in the settlement of the affairs of the bank are those which are shown by proof satisfactory to him, or by adjudication of a competent court, to have had their origin in something done before the insolvency. It is clearly his duty, therefore, in paying dividends, to take the value of the claim at that time as the basis of distribution."

This principle, thus applied to interest, must have equal application to credits from collections on collateral.

The cases we have already cited fully confirm the foregoing view as to credits after the filing of the proof of claim. It is vigorously

contended, however, that they do not countenance the view that credits shall not be allowed on claims for collections made after insolvency declared and before proof of claim. The exact point has been passed upon in but a few cases. In Kellock's Case, 3 Ch. App. 769, the court of chancery appeals adopted the rule that collections on collateral before filing proofs of claim in proceedings to wind up an insolvent company should be deducted, but that subsequent collections should not be.

The supreme court of Pennsylvania, in Miller's Appeal, 35 Pa. St. 481, in Patten's Appeal, 45 Pa. St. 151, and in several subsequent cases; and the supreme court of Rhode Island, in Allen v. Danielson, 15 R. I. 480, 8 Atl. 705,—took the contrary view, and held that no collections made on collaterals after the transfer of the assets in trust could be used to reduce the claims of secured creditors, whether made before or after filing proof of claim. In Morton v. Caldwell, 3 Strob. Eq. 162, the chancellor, in a most convincing opinion, reached the same result; but in Wheat v. Dingle, 32 S. C. 473, 11 S. E. 394, the supreme court of South Carolina destroyed the authority of that case in that state by adopting the rule in bankruptcy as to the claims of secured creditors.

A careful consideration of the question and of the principles which must govern its decision satifies us that there is no logical basis for any distinction between the effect of collections made after insolvency and before filing proof, and of those made after filing proof. Either they must both reduce the claim before dividend, or they must be given no effect. The theory upon which all the cases refusing to reduce the claim by collections subsequent to filing proof must be supported, is that, at the time of filing proof, the interest of the claimant in the assets is a fixed one, not to be varied by subsequent increase or decrease in the debt against the original debtor. What reason is there for fixing the date of filing proof as the time when the interest of creditors in the assets is to be determined? That is a date varying with each creditor, and dependent on all sorts of contingencies. The time when a man's interest is fixed and limited in property is when the act is done by which either the legal or the equitable title is transferred to him. As we have seen, the time for fixing the amount of the claim, so far as stoppage of interest is concerned, is the date of the declared insolvency. The same date, by the closest analogy, must be taken as the date for stopping reduction of the claim by credits from collections on collateral. That is the time when the creditor is deprived of his usual remedy of suit, judgment, and execution, and his equitable interest in the assets is substituted therefor. Upon that date each creditor becomes the owner, for the purpose of securing his debt, of that part of the assets of the bank which bears the same ratio to the whole property as his debt bears to the aggregate indebtedness. This interest in the assets remains fixed and constant until his debt is paid. In Miller's Appeal, 35 Pa. St. 481, a debtor executed a general assignment for the benefit of creditors. Subsequently the assignor became entitled to a legacy, which was attached by a creditor. It was held that such creditor was, not-

withstanding, entitled to the dividend out of the assigned estate on the whole amount of his claim from the time of the execution of the assignment. Justice Strong, afterwards of the supreme court of the United States, said:

"In the deed of assignment the equitable ownership of all the assigned property passed to the creditors. They became general proportioners, and each creditor owned such proportionate part of the whole as the debt due to him was of the aggregate of the debts. The extent of his interest was fixed by the deed of trust. It was, indeed, only equitable; but, whatever it was, he took it under the deed, and it was only as a part owner that he had any standing in court when the distribution came to be made. It amounts to very little to argue * * * that Miller's recovery of the legacy operated with precisely the same effect as if a voluntary payment had been made by the assignor after the assignment; that is, that it extinguished the debt to the amount recovered. No doubt it did, but it is not as creditor that he is entitled to the distributive share of the trust fund. His rights are those of the owner by virtue of the deed of assignment. The amount of the debt as to him is important only so far as it determines the extent of his ownership. The reduction of that debt, therefore, after the creation of the trust, and after his ownership had become vested, it would seem, must be immaterial."

The theory of the rights of creditors, secured and unsecured, in the assets, so admirably stated by Mr. Justice Strong, is the only one which will support the many cases we have cited above in which collections after proof of claim were not credited in reduction of dividends. In no one of them is there any limitation of the ratio decidendi inconsistent with our view, excepting in Kellock's Case, 3 Ch. App. 769, and perhaps in the language of the supreme court of Vermont in West v. Bank, 19 Vt. 403. In the cases cited from New York, New Hampshire, Connecticut, Kentucky, North Carolina, Illinois, Oregon, and Michigan the only reason why the exact point here raised was not decided as we have decided it was because in those cases no collections had been made between insolvency and proof of claim. In Kellock's Case, after deciding on principle that the rule in bankruptcy as to collateral is not the rule in equity, the learned lord justices fix the date of filing proof of claim as the date after which claims should not be reduced by proceeds from collateral. They do this as if they were making a rule of court, and do not base their conclusion on any argument as to the rights of the creditor, but chiefly on the ground of convenience. Under the companies' acts, the court of chancery was vested with a large discretion in formulating rules for the winding up of insolvent companies. The conclusion in Kellock's Case on this point is what Lord Justice Giffard, in the Warrant Finance Co.'s Case, 4 Ch. App. 643, 647, calls "judge-made" law. The American cases in Pennsylvania and Rhode Island fix the claim of the creditor as a constant quantity from and after the declared insolvency. They argue out this result as a matter of right, and not as a rule of convenience. We fully concur in the conclusion reached for the reasons stated, and we are of opinion that, even as a matter of convenience, the date of declared insolvency is the better date from which to estimate all claims. The date is the same for every creditor. It is fixed for him, and depends on no

volition of his.    It is pressed upon us that under this rule much
inequality will result.    It is said that a man who collects his
collateral the day before the declared insolvency will have the
right to prove and receive dividends on but a part of the original
debt, while the man who collects his collateral the day after the
declared insolvency can use his full claim to draw dividends.    We
see no anomaly or injustice in this.    It grows out of the nature
of the transfer in trust for the benefit of both.    It is much more
logical to have such a difference created by operation of law or
by deed of assignment and change of title than by the mere vol-
untary act of the creditor in filing proof of claim.

Our conclusion upon this main question in the case makes it
unnecessary for us to consider other questions discussed by coun-
sel, which were material only in the view taken by the court be-
low on the issue just considered.    If the Chemical Bank should re-
ceive from dividends and collections payment of the debt, principal
and interest, now owing to it by the Fidelity Bank, the question
would arise whether it could not properly be charged with the note
for $25,000 which, through negligence, it failed to collect.    It is
quite clear, however, that dividends declared and to be declared,
together with all collections from collaterals, including, as such,
the note just referred to, will fall far short of paying the $300,000
and interest due the Chemical Bank on the original debt.    The ques-
tion suggested, therefore, does not arise on the facts of the case.

The decree of the court below is reversed, with instructions to
enter a decree ordering the receiver to allow the claim of the Chem-
ical National Bank for $300,000, with interest to the day when the
Fidelity Bank suspended and was taken charge of by the agent of
the comptroller.

<hr />

(January 2, 1894.)

TAFT, Circuit Judge.    In the opinion already filed in this case
consideration was not given to the question of interest upon divi-
dends due to the Chemical National Bank.    Dividends on claims
against the Fidelity National Bank were declared by the comp-
troller of the currency as follows:    October 31, 1887, 25 per cent.;
June 15, 1889, 10 per cent.; June 30, 1890, 10 per cent.; and August
5, 1891, 5 per cent.

Although the receiver took charge of the assets of the Fidelity
Bank in June, 1887, the Chemical Bank did not present its claim for
allowance until April 5, 1890.    The delay was due to the fact that
the Chemical Bank had in its hands when the Fidelity Bank sus-
pended payment a large amount of bills receivable belonging to the
Fidelity Bank, the proceeds of which the Chemical Bank supposed it
could lawfully apply on this claim, and pay it in full.

On April 25, 1890, the receiver made the following offer to the
attorney for the Chemical Bank:

"The receiver of the Fidelity National Bank hereby rejects the accom-
panying claim for the amount stated, he claiming that all sums realized or
which should have been realized on the collaterals left with the Chemical

National Bank as security for this loan should be credited on the same, and said claim reduced in that amount; and that all sums that may hereafter be realized on said collateral should be used to reduce the amount of this claim. He is willing, and now offers, to accept a proof of claim from the Chemical National Bank for the sum of two hundred thousand dollars, and to pay to it the dividends heretofore paid and to be hereafter paid to other creditors thereon, without prejudice to its rights to sue upon the balance of said account not so allowed; with this stipulation, however: that should the court hold in any action that the receiver is right in his said claim, and is entitled to have all sums realized or which should have been realized on said collaterals credited on said claim, and a dividend paid only on the balance of the same, then, and in that case, all sums hereafter realized from said collaterals shall be applied to reduce the amount of said claim herein offered to be allowed, and the same percentage on such collections accounted for, by the Chemical National Bank, to the receiver, as have been paid to it by them. David Armstrong,

"Receiver Fidelity National Bank."

The offer thus made was not accepted.

We are of the opinion that no interest can be allowed on any dividends due the Chemical Bank for the period intervening between the time when such dividends were declared payable and the presentation of the claim of the bank. The damage to the Chemical Bank from this delay was self-imposed. The money applicable to such dividends lay during this period of two years and six months in the treasury of the United States drawing no interest. It would be manifestly unjust to the other creditors to reduce their share in the assets of the defunct bank to compensate the Chemical Bank for a loss of its own making. However bona fide its belief may have been in its power to pay its debt in another way, we do not see why the other creditors should be made to suffer for its mistake.

The question whether the Chemical Bank should receive interest on the dividends to be paid on the $200,000 which the receiver offered to allow, turns on the further question whether he affixed to his offer to pay these dividends a condition which would prejudice in any way the rights of the Chemical Bank. The counsel for the bank contends that the receiver's offer, properly construed, required the bank to agree that if the court should decide that the claim must be reduced by all sums which had been or should have been realized before the presenting of the claim, then the bank would reduce its claim not only by so much thus adjudicated to be a proper reduction, but also by any sums realized after presentation, though not adjudicated to be proper reductions. The language of the receiver in his offer is not as fortunate as it might be, but we do not think it can bear the construction contended for.

When the offer was made, the Chemical Bank had collected $75,000. and had negligently failed to collect $25,000. This, according to the receiver's contention, reduced the claim of the bank to $200,000. The Chemical Bank had other collateral applicable to the debt, but this had not then been collected. According to the receiver's contention, collections on this latter collateral should also reduce the claim.

The obscurity in the receiver's language arises from the clause in the second paragraph which follows the clause "that the receiver is right in his said claim." The following clause reads thus:

"And is entitled to have all sums realized or which should have been realized on said collaterals credited on said claim, and a dividend paid only on the balance of the same." It is manifest that "his said claim" refers to the receiver's state-ment of his rights in the first paragraph, in which he maintained that the Chemical Bank must reduce its claim by all sums then or thereafter realized from collateral, or which should have been real-ized therefrom. The clause following the words "his said claim" was evidently intended to be a mere repetition of that statement. If the statement and its repetition are capable of having the same meaning, they should be given it. "All sums realized" may mean "all sums now realized," or it may mean "all sums now or hereafter realized." To have the same meaning as the claim of the receiver already stated in the first paragraph, and specifically referred to, the words must be given the latter meaning. The receiver's propo-sition was, therefore, to allow and pay dividends upon $200,000 of the claim without prejudice, on the one hand, to the right of the Chemical Bank to sue for the allowance of the remaining $100,000, and without prejudice, on the other hand, to the right of the receiver to reduce the claim below $200,000 in case the court should hold such reduction proper. Thus construed, the offer was an equitable one, and the refusal of the Chemical Bank to accept dividends under conditions which did not prejudice its right in any way must pre-vent the payment of interest to it on dividends due the $200,000 part of its claim. The money which it could have drawn on this part of the claim remained in the United States treasury, earning no inter-est. The Chemical Bank cannot charge the other creditors with interest for its own delay.

It remains only to consider the interest on the dividends to be paid on the $100,000 which should have been allowed by the re-ceiver in accordance with the opinion of this court at the time that he rejected the claim. The question at issue between the receiver and the Chemical Bank was one of such doubt that it would have been quite improper for him not to try it in court. The chance of his sustaining his view was sufficiently great to make any reasonable expense, in seeking to maintain it in court, a fair charge against the other creditors because of the possible benefit they might derive by a successful issue of the litigation. Now, a part of the reasonable expense of refusing to pay what is believed to be an unjust claim, but which is held thereafter to be a just one, is the damage from the delay to the person to whom the payment should have been made, —a damage which is measured by interest on the amount due and unpaid during such delay. It is equitable and just, therefore, that the share of the other creditors in the assets of the bank should be reduced by enough to pay the interest on the delayed dividends on the $100,000 from the date of the rejection of the claim until such dividends are paid. This conclusion is fully sustained by the deci-sion of the supreme court in the case of Armstrong v. Bank, 133 U. S. 433, 10 Sup. Ct. 450. In that case—which also grew out of the failure of the Fidelity Bank—the creditor bank had presented its claim to the receiver, in September, 1887, and it was rejected. The

circuit court held that the claim should have been allowed, and adjudged that interest must also be allowed on the dividend declared October 31, 1887, until the dividend should be paid. The supreme court affirmed the circuit court both in regard to the validity of the claim and also as to the interest, saying, upon page 470, 133 U. S., and page 450, 10 Sup. Ct.: "The allowance of that interest is necessary to put the plaintiff on an equality with other creditors."

We think that the receiver was entitled to take a reasonable time in which to consider and reject or accept the claim of the Chemical National Bank after its presentation; that 20 days was not unreasonable; and, therefore, that no interest should be allowed on any dividend until after April 25, 1890.

Interest will be allowed on the first two dividends, on one-third of the claim as allowed, from April 25, 1890, until the dividends shall be paid. Interest will also be allowed on the dividend declared June 30, 1890, on one-third of the claim, as allowed, from the date the dividend was declared payable until it shall be paid. Interest will also be allowed on the dividend declared August 5, 1891, on one-third of the claim, until the dividend shall be paid. It is admitted that upon July 25, 1892, the receiver paid to the Chemical National Bank $100,000. We think it just that this $100,000 should be applied as a credit upon the dividends on the two-thirds of the claim, as allowed, which do not bear interest.

The judgment of this court, therefore, will be that the decree of the court below is reversed, and that the cause be remanded, with instructions to enter a decree in accordance with this opinion.