WASHINGTON–ALASKA BANK et al. v. DEXTER HORTON NAT. BANK OF SEATTLE, WASH.

(Circuit Court of Appeals, Ninth Circuit. February 24, 1920.)

No. 3218.

1. BANKS AND BANKING ⬅80(1)—SECURED CREDITOR OF INSOLVENT BANK HELD ENTITLED TO DIVIDENDS ON FULL CLAIM, REGARDLESS OF COLLECTIONS ON COLLATERAL.

One having a claim against an insolvent bank in the hands of a receiver, secured by collateral, could prove for, and receive dividends on, the full amount of the claim, regardless of sums received from the collateral after transfer of the assets to the receiver, provided he did not receive more than the full amount due, especially where the receiver agreed to pay the claimant the same dividends paid other creditors in consideration of a delay in selling the collateral.

2. PLEDGES ⬅19—INTEREST AS WELL AS PRINCIPAL IS SECURED.

A pledge of stock to secure an interest-bearing debt secured the interest as well as the principal of the debt.

3. BANKS AND BANKING ⬅80(4)—STATE LAW AS TO PRIORITIES DOES NOT APPLY TO BANK DOING BUSINESS IN ANOTHER STATE.

Act Nev. March 24, 1909 (St. 1909, c. 191), giving priority to the claims of depositors and holders of exchange against insolvent banks over all other claims, except taxes, does not apply to a bank incorporated under the laws of Nevada, but doing business in Alaska.

4. CORPORATIONS ⬅640—RULE AS TO EXTRATERRITORIAL FORCE OF LAWS OF STATE OF INCORPORATION STATED.

The laws of the state in which a corporation is organized, which become a part of its charter, follow the corporation when it engages in business in another state; but those laws which regulate corporations in their manner of doing business in the state do not follow it into another state.

5. BANKS AND BANKING ⬅63—STATUTE GIVING PREFERENCE TO CLAIMS OF DEPOSITORS HELD REPEALED.

Act Nev. March 24, 1909 (St. 1909, c. 191), giving claims of depositors and holders of exchange priority over other claims against insolvent banks, except taxes, was repealed by St. Nev. 1911, c. 150, regulating banking and other matters relating thereto, which gives no such preference.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. BANKS AND BANKING ⊗⟶77(6)—FAILURE TO OBTAIN LEAVE TO SUE RECEIVER IS CURED BY HIS APPEARANCE AT COURT'S DIRECTION WITHOUT OBJECTION.

The failure to obtain leave of the court appointing a receiver for an insolvent bank to sue him to foreclose a lien on collateral security for a debt was cured, and the judgment was not void, where the court directed the receiver to appear and answer, and he did so without raising the defense that prior permission to bring the suit had not been given.

Ross, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Fourth Division of the Territory of Alaska; Charles E. Bunnell, Judge.

Claim by the Dexter Horton National Bank of Seattle, Wash., against the Washington-Alaska Bank and F. B. Noyes, receiver thereof. From an order directing payment of the claim, defendants appeal. Affirmed.

The Washington-Alaska Bank, of Nevada, a corporation incorporated under the laws of Nevada, was doing a banking business in the territory of Alaska, at Fairbanks. On January 5, 1911, it went into the hands of receivers. At that time it was indebted to appellee in the sum of $129,465.62, for the payment of which the appellee held as collateral security 96 shares of the capital stock of the Gold Bar Lumber Company. On December 26, 1910, the Washington-Alaska Bank sent by express to the appellee, at Seattle, gold coin, bullion, and currency to the value of $101,000 to be applied on said indebtedness, but after the appointment of the receivers the Washington-Alaska Bank seized the said $101,000 while it was in the hands of the express company in transit. Their right to do so was upheld by this court in Dexter Horton National Bank v. Hawkins, 190 Fed. 924, 111 C. C. A. 514. On March 26, 1912, the appellee presented its claim to the receivers of the Washington-Alaska Bank, and the same was allowed in the sum of $129,465.62.

Prior thereto, and during the year 1911, the receivers paid to unsecured creditors dividends amounting in the aggregate to 50 per cent. of their claims. Thereafter the then receiver and the appellee entered into a written agreement, which was signed by the receiver on July 13, 1912, and by the appellee on November 22, 1912, wherein it was recited that the appellee was entitled to receive payment of a 50 per cent. dividend on its claim, as had been paid to other creditors; that the appellee held shares of the Gold Bar Lumber Company stock as collateral security; that it was the desire of the receiver that the collateral be not sold or converted without his consent prior to June 1, 1913, and that he would pay to the appellee, on account of the dividends which it was entitled to receive, the sum of $25,000, and pay the balance of the 50 per cent. as fast as funds were available, and before December 1, 1912, if possible; that in consideration thereof the appellee agreed not to sell or convert its collateral prior to December 1, 1912, without the receiver's consent; and that, if the balance of the dividend due it were paid it by that date, it would not convert the collateral prior to June 1, 1913. The receiver further agreed that, should any further dividends be declared and paid to other creditors, the appellee should receive the same rate of dividends as other creditors until its claims were paid in full.

Pursuant to the agreement the receiver paid the appellee $25,000, but made no further payments. On April 9, 1913, the appellee commenced its suit in equity in the superior court for King county, state of Washington, against the Washington-Alaska Bank and its receiver, to foreclose its lien on the collateral and for judgment. Judgment was duly rendered in accordance with the prayer of the complaint for $126,907.80, which was the amount of the claim, after deducting the $25,000 payment and adding interest. The collateral was sold for $100,000, leaving a balance due on the appellee's judgment on January 30, 1914, of $27,248.76. Upon the foregoing facts the court below entered

its order directing the receiver to pay to the appellee $27,225.47, with interest at 6 per cent. per annum from January 30, 1914, out of any funds in his hands belonging to the insolvent estate and applicable to the payment of debts, before making any further payment to other creditors. It is from this order that the appeal is taken.

De Journel & De Journel, of San Francisco, Cal., and Roy V. Nye, of Monrovia, Cal., for appellants.

A. R. Heilig, of Fairbanks, Alaska, and Peters & Powell, of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] The appellant contends that there remained due only $4,510.67 of the appellee's original claim after applying the $25,000 payment of August 6, 1912, and the net amount which was realized on the foreclosure sale, and that the remainder of the appellee's claim, as allowed by the court below, represents interest, which the appellee was not entitled to receive out of the estate in the hands of the receiver. The court below applied the rule established in Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640, that the creditor can prove for and receive dividends upon the full amount of his claim, regardless of any sums received from his collateral after the transfer of the assets from the debtor in insolvency, provided that he shall not receive more than the full amount due him, and held that any doubt as to the applicability of the rule was dissolved when consideration was had of the terms of the contract between the receiver and the appellee, a contract which was made with the approval of the court below, and the fact that at the time when the contract was made the value of the Gold Bar stock was considered both by the appellee and the receiver to be far in excess of the appellee's claim against the Washington-Alaska Bank, and the fact that the validity of the contract was established in the suit in the Washington state court, judgment in which was affirmed on appeal to the Supreme Court. Dexter Horton Nat. Bank v. Wash.-Alaska Bank, 86 Wash. 452, 150 Pac. 1176.

[2] We are not convinced that the court below was in error in so ruling. A pledge which secures an interest-bearing debt secures the interest as much as the principal of the debt. In Richmond & I. Const. Co. v. Richmond, N. I. & B. R. Co., 68 Fed. 105, 116, 15 C. C. A. 289, 300 (34 L. R. A. 625), Judge Lurton said:

"If interest is properly due, as between creditor and debtor, the interest is just as much a part of the principal claim as the principal thereof."

In Chemical Nat. Bank v. Armstrong, 59 Fed. 372, 378, 8 C. C. A. 155, 161 (28 L. R. A. 231), Judge Taft, after reviewing the authorities, said:

"The exact point which is common to all the foregoing authorities, and which they all sustain, is that a creditor who has proved his claim against an insolvent estate under administration can collect his dividends without any deduction from his claim as proven for collections made from collateral after his proof of claim is filed."

Cases of similar import are Hitner v. Diamond State Steel Co. (C. C.) 176 Fed. 390; New York Security & Trust Co. v. Lombard Invest. Co. (C. C.) 73 Fed. 537; Savings Bank v. Robert H. Jenks Lumber Co. (C. C.) 194 Fed. 732.

[3, 4] The appellant's principal contention is that the payment to the appellee was prohibited by a law of the state of Nevada, which gave priority to the claims of "depositors for deposit" and the claims of "holders of exchange" over all other claims, except taxes, and declared such claims to be a first lien on all of the assets of banking corporations at the time of closing the bank. Act March 24, 1909 (Laws Nev. 1908–1909, p. 251). We are unable to agree that the said banking law of Nevada has any bearing upon the question of distribution of assets here involved, notwithstanding that the bank was incorporated under the general incorporation law of Nevada. A marked distinction is observed between the laws of the state which became a part of the charter of the corporation and those laws of the state which regulate corporations in their manner of doing business in the state. The former will follow the corporation when it engages in business in another state. The latter will not. In Jesson v. Noyes, 245 Fed. 46, 157 C. C. A. 342, this court held that the Washington-Alaska Bank was bound by the provisions of the general incorporation laws of Nevada prescribing the powers of directors of corporations. We so held on the ground that that law entered into the charter of the bank and controlled the action of its directors in whatever state they might go to do business. But the act of the Legislature of Nevada of March 24, 1909, was enacted after the incorporation of the Washington-Alaska Bank, and its purpose was to regulate corporations engaged in the banking business in the state of Nevada, and to protect depositors in such banks. In 12 R. C. L. p. 25, it is said:

"A corporation created by the laws of another state, therefore, does not bring into every state where it transacts business the general legislation or judicial decisions of the state in which it is organized, but such general laws and regulations or the decisions of the courts of a sister state are controlling only within its own limits, and such state has no power to give them force or effect in other jurisdictions."

In 2 Mor. Priv. Corp. § 967, it is said:

"The charter contract alone is recognized. It is the charter alone which is recognized by the laws of comity, and not the general legislation of the state in which the corporation was formed. The general laws and regulations of a state are intended to govern only within the limits of the state enacting them, and a state would have no power to give them extraterritorial force."

In Guilford v. Western Union Tel. Co., 59 Minn. 332, 61 N. W. 324, 50 Am. St. Rep. 407, the court held:

"It is only the charter of the corporation, constituting the agreement between it and its stockholders, which will be recognized as binding in other states, and not the general laws of the foreign state, affecting merely the remedy, which govern only within the state enacting them."

In Warren v. First Nat. Bank of Columbus, 149 Ill. 9, 38 N. E. 122, 25 L. R. A. 746, it was held that the charter alone of a foreign corporation, and not the general legislation of the state in which it

was created, will have effect to limit its powers outside of the state, and that a New York statute prohibiting assignment or transfers by insolvent corporations has no extraterritorial force and does not affect the validity of an assignment by an insolvent corporation executed in Ohio of a transfer of funds in Illinois. In Ohio Life Ins. Co. v. Merchants Ins. Co., 11 Humph. (Tenn.) 1, 53 Am. Dec. 742, it was held that the general law of a state prohibiting corporations from engaging in the banking business, unless expressly formed for that purpose, has no force beyond the limits of the state, but that it is otherwise if such a restriction is contained· in the charter. In Borton v. Brines-Chase Co., 175 Pa. 209 (34 Atl. 597) it was held that—

"A general assignment or confession of judgment may be made by a foreign insolvent corporation in Pennsylvania, though the laws of its own state prohibit insolvent corporations from doing so."

Of similar ·import is Pairpoint Mfg. Co. v. Phila. Optical Co., 161 Pa. 17, 28 Atl. 1003.

In East Side Bank v. Columbus Tanning Co., 170 Pa. 1, 32 Atl. 539, it was held that the statute of New York forbidding preferences by insolvent corporations did not render void a preference judgment taken in Pennsylvania against an insolvent corporation organized under the laws of New York, but holding its entire property in Pennsylvania. In Franklin Trust Co. v. State of New Jersey, 181 Fed. 769, 104 C. C. A. 629, where a corporation organized under the laws of New Jersey, but whose business interests and all of its property were in another state, had become ·insolvent and was being wound up in that state, it was held that a franchise tax imposed upon it under the law of New Jersey, after the commencement of the insolvency proceedings, could not be enforced in the court of the foreign jurisdiction, and given priority of payment over the claims of bona fide local creditors. In United States Mortgage Co. v. Sperry (C. C.) 24 Fed. 838, Judge Gresham held that a New York corporation doing business in Illinois was not bound by the New York statute which provided that no loan should be made at a rate of interest exceeding the legal rate, which in New York was 7 per cent. In Boehme v. Rall, 51 N. J. Eq. 541, 26 Atl. 832, the court held that, where a foreign corpora·· tion executes in New Jersey a mortgage on property within that state to resident creditors to secure payment of debts contracted and payable there, the mortgage will ́not be held invalid ,because the execution thereof was contrary to the general statute of the state in which the corporation was incorporated. There are numerous other decisions sustaining the doctrine above declared by the text-writers and announced by the courts, notably White v. Howard, 38 Conn. 342; Hannis Dis. Co. v. Baltimore, 114 Md. 678, 80 Atl. 319; Castle's Adm'r v. Acrogen Coal Co., 145 Ky. 591, 140 S. W. 1034; Fowler v. Bell, 90 Tex. 150, 37 S. W. 1058, 39 L. R. A. 254, 59 Am. St. Rep. 788; Com. Nat. Bank v. Motherwell Iron & S. Co., 95 Tenn. 172, 31 S. W. 1002, 29 L. R. A. 164.

[5] In brief, the Washington-Alaska Bank, as its name indicates, was incorporated in Nevada for the purpose of engaging in business

elsewhere than in that state. As to its corporate powers it was governed by its charter, but when it engaged in the banking business in Alaska it became subject to the local laws. Depositors and others who dealt with it as a bank were not required to search the statute of Nevada to ascertain what their rights were. They were entitled to rely upon the laws of the territory where the bank was engaged in business. The act of March 24, 1909, was, as its title indicates, a general act to define and regulate the business of banking, and to create a state banking board and a bank examiner. In the body of the act are found numerous expressions of the purpose to regulate banking "in this state." It contains no indication of the intention of the Legislature to inject any of its provisions into the charters of banking corporations theretofore or thereafter to be incorporated. Two years later the Legislature passed a new act "to regulate banking and other matters relating thereto" (St. 1911, p. 291), which expressly repeals all prior acts and parts of acts in conflict with its provisions. It gives no preference to claims of depositors or others. That it was the intention to repeal the act of 1909 in toto is further shown in the Revised Laws of Nevada of 1912, where the law of 1911 is restated, and a note in volume 1, p. 209, declares that the latter act supersedes the act approved March 24, 1909.

[6] The appellant contends that the judgment in the foreclosure proceeding is void, for the reason that no permission was obtained from the court below to bring the suit against its receiver, and Barton v. Barbour, 104 U. S. 126, 26 L. Ed. 672, is cited as holding that consent to sue a receiver is jurisdictional. This contention was not made in the court below, and it is not embraced in any of the assignments of error. It is based upon the proposition that the judgment of foreclosure is absolutely void for want of jurisdiction. In Barton v. Barbour a plea to the jurisdiction was interposed, and the question before the Supreme Court was the sufficiency of that plea. In the foreclosure suit in question here, not only was there no plea to the jurisdiction, but the court below directed its receiver to appear and answer the suit, which he did without raising the defense that prior permission had not been given to bring the suit. In 3 Street's Fed. Eq. Prac. 2676, it is said:

"It is a general principle of equity practice that a suit cannot be brought against a receiver, in his capacity as such, to recover any property in his hands, or to recover on any debt, demand, or claim whatever against him, unless upon previous leave first duly obtained. This rule applies to suits brought either in that court or in any other court; and if an unauthorized suit be brought against the receiver, he may successfully plead the disability of the plaintiff."

We think the instruction which the Alaska court gave to its receiver is in effect an order permitting the institution of the foreclosure suit, and the fact that the receiver in compliance therewith appeared in the suit and defended the same, and acquiesced in the course of the plaintiff in prosecuting the same, should be held to have cured the informality which attended the commencement of the proceeding, and that the judgment in the foreclosure suit cannot be regarded as abso-

lutely void. Elkhart Car-Works Co. v. Ellis, 113 Ind. 215, 15 N. E. 249; Mulcahey v. Strauss, 151 Ill. 70, 37 N. E. 702; Flentham v. Steward, 45 Neb. 640, 63 N. W. 924; In re Young (D. C.) 7 Fed. 855; Naumberg v. Hyatt (C. C.) 24 Fed. 898, 901.

The decree is affirmed.

ROSS, Circuit Judge (dissenting). It is contended on behalf of the appellants, among other things, that by reason of the laws of the state of Nevada, under which the insolvent bank was incorporated, the appellee was not entitled to any payment out of the funds in the hands of the receiver until all of the depositors of the bank, as well as all holders of exchange against it, were paid in full, which full payments, it is undisputed, have never been made; the record showing the unsecured creditors to have been paid but 50 per cent. of their allowed claims.

One of the provisions of the Constitution of Nevada in force at the time the insolvent bank was organized declared:

"The Legislature shall pass no special act in any matter relating to corporate powers except for municipal purposes; but corporations may be formed under general laws, and all such laws may from time to time be altered or repealed." Article 8, § 1.

The subsequent act of March 24, 1909 (St. 1909, p. 251), of its Legislature, provided, among other things, as follows:

"Sec. 3. The term 'bank' or 'banking corporation,' as used in this act, shall be construed to mean any incorporated banking institution which shall have been incorporated under the laws of this state, as they existed prior to the taking effect of this act, and to such banking institutions as shall hereafter become incorporated under the provisions of this act. The term 'commercial bank' shall be construed to mean any such banking institution as shall, in addition to the exercise of other powers, follow the practice of repaying deposits upon check, draft, or order, and of making commercial loans chiefly; the term 'savings bank' shall be construed to mean any such banking institutions as shall, in addition to the exercise of other powers, follow the practice of repaying deposits only upon the presentation of passbooks, and whose loans are chiefly made on real estate security."

"Sec. 48. The claims of depositors, for deposits, and claims of holders of exchange shall have priority over all other claims, except federal, state, county and municipal taxes, and subject to such taxes, shall at the time of closing of the bank be a first lien on all the assets of the banking corporation from which they are due and thus under receivership; upon proof thereof, they shall be paid immediately out of the available cash in the hands of the receiver. If the cash in the hands of the receiver, available for such purpose, be insufficient to pay the claims of the depositors, the court in which the receivership is pending, or a judge thereof, shall determine the amount required to supply the deficiency, and cause the same to be certified to the State Banking Board, which shall thereupon draw against the depositors' guaranty fund in the amount required to supply such deficiency, and shall forthwith transmit the same to the receiver, to be applied on the said claims of depositors."

"Sec. 59. The powers, privileges, duties and restrictions conferred and imposed upon any corporation or individual, existing and doing business under the laws of this state are hereby abridged, enlarged or modified as each particular case may require, to conform to the provisions of this act notwithstanding anything to the contrary in their respective articles of incorporation or charters. The legality of investments heretofore made, or of transactions heretofore had, pursuant to any provisions of law in force when such investments were made or transactions had, shall not be affected by the provisions

of this act, except as the same can be done gradually by the sale or redemption of the securities so invested in, in such manner as to prevent loss or embarrassment in the business of such corporation or individual, or unnecessary loss or injury to the borrowers of such security, subject always to the approval of the state banking board."

"Sec. 61. Each section of this act, and every part of each section is hereby declared to be independent sections and parts of sections, and the holding of any section or part thereof to be void, or ineffective for any cause, shall not be deemed to affect any other section or part thereof."

The court below gave no effect to the foregoing provisions of the Nevada statutes, but in its opinion said, in effect, that but for the contract entered into July 13, 1912, between the appellee and the receiver, it would pursuant to its understanding of the decisions of the Supreme Court in the cases of Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640, and Aldrich v. Chemical National Bank, 176 U. S. 618, 20 Sup. Ct. 498, 44 L. Ed. 611, make the following determination of the case:

"The Washington-Alaska Bank owed the Dexter Horton National Bank on the 4th day of January, 1911, the sum of $129,465.62. The 96 shares of Gold Bar Lumber Company stock, of uncertain value, held as a pledge, were sold by order of court in the state of Washington, and the proceeds of such sale on the 30th day of January, 1914, amounted to $99,954.95. The delay in realizing on this pledge was not the fault of the petitioner, and therefore it is necessary to ascertain what sum of money at 6 per cent. interest per annum on January 4, 1911, would amount to $99,954.95 on January 30, 1914. This sum is $84,421.41. The petitioner would therefore be entitled to participate in dividends, the same as other creditors, calculated on the sum of $45,044.21. Dividends of 16⅔ per cent. each were declared January 9, April 8, and November 7, 1911, respectively, and were not paid to petitioner. Calculating interest thereon from the date declared to August 8, 1912, on which date the petitioner was paid the sum of $25,000, it is found that by the payment of the $25,000 the petitioner was overpaid to the extent of $833.75. Future dividends would be calculated on the sum of $45,044.21, but from the first dividend or dividends declared the sum of $833.75 would be deducted."

The court, however, holding the contract to be valid and binding upon the parties to it, summarized their rights thus, and gave judgment accordingly:

"The claim on January 5, 1911, was for the sum of $129,465.62, on which there was a payment of $25,000 August 6, 1912. The proceeds of the sale of the Gold Bar stock January 30, 1914, amounted to $99,954.95. There was therefore due the Dexter Horton Bank on that date the sum of $27,225.47. The petitioner asks for interest on this sum at 8 per cent. per annum from January 30, 1914. In my opinion the Washington courts have determined that the original contract was a contract under the laws of the state of Washington. Interest will be allowed at 6 per cent. per annum."

In the case of Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640 (adhered to in Aldrich v. Chemical National Bank, 176 U. S. 618, 636, 20 Sup. Ct. 498, 44 L. Ed. 611) the Supreme Court distinctly adjudged inapplicable to cases like the present one the rule governing cases arising under the bankruptcy laws, which the court declared proceeds upon the principle of election, permitting the creditor to prove his whole debt by surrendering his security, or, in the event of his holding it, to prove only

for any existing deficiency after extinction of the security, but that where, as in the present case, there is a secured creditor of an insolvent national bank, he "may prove and receive dividends upon the face of his claim as it stood at the time of the declaration of insolvency, without crediting either his collaterals or collections made therefrom after such declaration, subject always to the proviso that dividends must cease when, from them and from collaterals realized, the claim has been paid in full"—the court further saying, near the end of its opinion:

"Whatever Congress may be authorized to enact by reason of possessing the power to pass uniform laws on the subject of bankruptcies, it is very clear that it did not intend to impinge upon contracts existing between creditors and debtors, by anything prescribed in reference to the administration of the assets of insolvent national banks. Yet it is obvious that the bankruptcy rule converts what on its face gives the secured creditor an equal right with other creditors into a preference against him, and hence takes away a right which he already had. This a court of equity should never do, unless required by statute, at the time the indebtedness was created."

There is here express recognition of what, it seems to me, would otherwise be very plain, that the rules governing courts of equity in the distribution of insolvent estates are never so applied as to violate any statutory provision regulating the rights of the parties. The court below was bound to take judicial notice of the statutes of Nevada, under which the insolvent bank was organized and which constituted its charter. Bank v. Francklyn, 120 U. S. 751, 7 Sup. Ct. 757, 30 L. Ed. 825; Lamar v. Micou, 114 U. S. 223, 5 Sup. Ct. 857, 29 L. Ed. 94; Owings v. Hull, 9 Pet. 607, 9 L. Ed. 246; Jesson v. Noyes, 245 Fed. 46, 157 C. C. A. 342; Merchants Exchange Bank v. McGraw, 59 Fed. 972, 8 C. C. A. 420; Story's Eq. Plead. (10th Ed.) § 20.

Equally clear is it, I think, that all parties dealing with this national bank, including, of course, the appellee Dexter Horton National Bank, were charged with notice that its very charter expressly declared that claims of its depositors for deposits, and claims of holders of exchange against it, shall "have priority over all other claims, except federal, state, county and municipal taxes, and subject to such taxes shall at the time of closing of the bank be a first lien on all the assets of the banking corporation from which they are due and thus under receivership." In Chemical National Bank v. Armstrong, 59 Fed. 372, 8 C. C. A. 155, 28 L. R. A. 231 (referred to with approval by the Supreme Court in the cases of Merrill v. National Bank of Jacksonville and Aldrich v. Chemical National Bank, supra), Judge Taft, speaking for the court, said:

"The suspension of the bank, and its seizure by the Comptroller and his appointee, the receiver, work, by operation of law, a transfer of the title to the assets of the bank from the bank to the Comptroller and receiver, in trust to reduce the assets to money, and apply them, as directed by the National Banking Act—first, to the redemption of the circulating notes of the bank; and, second, in ratable distribution to the creditors of the bank. Scott v. Armstrong, 146 U. S. 499, 13 Sup. Ct. 148 [36 L. Ed. 1059]; White v. Knox, 111 U. S. 784, 4 Sup. Ct. 686 [28 L. Ed. 603]. * * * It is true that under the Bankruptcy Act it was provided that a secured creditor, if he would prove for his full claim, must surrender his collateral, or else be content to prove

for the difference between his full claim and the value of his collateral.  Rev. St. § 5075.  The bankruptcy law is not now in force, however, and it was expressly held in the case of Cook County Nat. Bank v. U. S., 107 U. S. 445, 2 Sup. Ct. 561 [27 L. Ed. 537], that the priorities and method of distribution under the bankrupt law had no application to the winding up of insolvent national banks.  It was said that the National Banking Act contained within itself a complete system for distributing the assets and determining the priorities, and that a priority secured to the United States under the bankrupt law would not be enforced in their favor under the banking act."

The cases above cited clearly recognize the controlling force of statutory law prescribing how the distribution of the assets of an insolvent corporation, organized under and by virtue of its provisions, shall be made, regardless of whether the insolvent bank be a national or a state bank.  I am, of course, aware of the distinction that exists between the laws of a state which merely regulate corporations in their manner of doing business within it and the laws of the same state which become a part of the charter of a corporation which has been incorporated under its laws.  That the latter will follow such corporation when it engages in business outside of the state of its incorporation I do not understand to be questioned.  But it is contended, and by the majority of this court in effect held, that the purpose of the above-mentioned act of the state of Nevada of March 24, 1909, was merely to regulate the banking business carried on in that state, and to provide for the distribution of the assets of insolvent banks within Nevada only.  If so, I readily concede that that statute has nothing to do with this case.

A number of cases are cited where state courts have refused to give effect to charter provisions of foreign corporations doing business within their state, some upon the ground that they conflict with the rights of local creditors, or with the laws or public policy of the state within which it was sought to enforce such charter provisions, and some because of the construction that the true intent of the particular legislation in question was that it should not become a part of the charter of the corporation organized under its laws, but apply only to its business within the state.  An apt illustration of the latter is the case of Mutual Life Ins. Co. of New York v. Cohen, 179 U. S. 262, 21 Sup. Ct. 106, 45 L. Ed. 181.  That company was organized under the laws of New York, which state enacted a statute providing that—

"No life insurance company doing business in the state of New York shall have power to declare forfeited or lapsed any policy hereafter issued or renewed by reason of nonpayment of any annual premium or interest, or any portion thereof, except as hereinafter provided."

The insurance policy there involved contained a stipulation that it should not be binding until the first premium had been paid and the policy delivered, both of which acts were done in the state of Montana; the contract thereupon becoming a Montana contract, and governed by its laws.  In Montana, there being no statutory provision to the contrary, the failure to pay the annual premium worked, in accordance with the terms of the policy, a forfeiture of all claims against the company.  The court held that the provision of the New York statute

quoted had no application to a policy issued by the company in another state, saying:

"The New York statute does not purport to change any insurance company charter. On the contrary, its obvious purpose is only to reach business transacted within the state. Proceeding on the accepted principle that a state may determine the conditions, the meaning and limitations of contracts executed within its borders, the language of the statute reaches contracts made within the state. * * * It is not doubted that a contract by an insurance company of New York, executed elsewhere, may by its terms incorporate the law of New York, and make its provisions controlling upon both the insured and the insurer. And it is urged that, although there is nothing in the policy to indicate this, the language of the application has that effect. It recites that it is 'subject to the charter of such company and the laws of said state,' and the contract refers to the application, and declares that it is issued 'in consideration of the application for this policy and of the truth of the several statements made therein.' While the contract is based upon the application, yet the latter is only a preliminary instrument, a proposal on the part of the insured, and a stipulation that it shall be controlled by the charter and the laws of the state is not tantamount to a stipulation that the policy issued thereon shall also in like manner be controlled. That such language was incorporated into the application is not strange. Its meaning is clear, and is that no local statute as to the effect of statements or representations or any other matter in the application should in these respects override the provisions of the charter and the laws of New York. In other words, if by the charter or the laws of New York any statement in an application is to be taken as a warranty, no local statute declaring that all statements in an application are to be taken as simply representations shall override the terms of the charter and the New York law. But that is very different from a provision that the contract issued upon such application should also be in all its respects controlled by the laws of New York."

It will be observed that there is not in the Nevada statute here involved, as there was in that of New York involved in the case just cited, a reference to the *place* where the incorporation shall be doing business, but the positive declaration that the term "bank" or "banking corporation," used in the Nevada statute, *shall be construed to mean any incorporated banking institution which shall have been incorporated under the laws of that state as they existed prior to the taking effect of the act of March 24, 1909,* and of such banking institutions as should thereafter become incorporated thereunder, with the further express declaration, contained in section 61, that—

"Each section of this act, and every part of each section, is hereby declared to be independent sections and parts of sections."

As is well said by counsel for the appellant, depositors are practically certain to be, holders of exchange are very likely to be, residents of the jurisdiction where a bank does business. Correspondent banks are in many instances, as in that at bar, concerns in foreign jurisdictions. "What principle of public policy requires that such resident depositors and holders of exchange shall not be paid out of insolvent estates before such foreign correspondent banks are paid therefrom?" asks counsel. I know of none, nor do I know of any principle of the common law which forbids it; and it is not claimed that there is any statute in force in Alaska to the contrary.

It does not seem to me that the Nevada statute can be properly so

construed as to limit its provisions to such business as is done by the banks or banking institutions, therein referred to, within the state of Nevada, but that the provision in question was an alteration of the laws under which the appellant bank was incorporated; that is to say, an alteration of its charter, which was expressly authorized by article 8, § 1, of the Constitution of Nevada.

In my opinion the judgment should be reversed, with directions to the court below to dismiss the petition, at the petitioner's cost.